2023 IL App (1st) 220320

SIXTH DIVISION
May 19, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-22-0320

| | | |
|---|---|---|
| MARVIN BUCHANAN, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 19 CH 13670 |
| THE COOK COUNTY SHERIFF'S MERIT BOARD and | ) | |
| THOMAS J. DART, in His Official Capacity as Sheriff of | ) | Honorable |
| Cook County, | ) | Michael T. Mullen, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices C.A. Walker and Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    The appellant in this case, deputy sheriff Marvin Buchanan, was one of four deputies in the Cook County Court Services Department (Court Services) that Sheriff Thomas J. Dart (Sheriff) asked the Cook County Sheriff's Merit Board (Merit Board or Board) to terminate after an incident in which a female detainee at the Markham Courthouse was alleged to have been sexually assaulted in a restroom cell by two male detainees. Deputy Buchanan contends on appeal that the Board's basis for his termination was unsupported by the evidence. For the following reasons, we agree and reverse the Board's decision and remand to the Board with an order that Deputy Buchanan be

reinstated with backpay.

¶ 2                                    I. BACKGROUND

¶ 3                         A. The Sheriff's Complaint to Terminate

¶ 4      The Sheriff alleged that on May 2, 2017, two of the detainees for whom Deputy Buchanan was responsible at the Markham Courthouse sexually assaulted a female detainee in another cell. The Sheriff further alleged that after Deputy Buchanan "knew there was a possibility that a criminal act had been committed," he did not indicate in his initial report that he had retrieved a male prisoner from the restroom cell where this allegedly occurred. The Sheriff also alleged that Deputy Buchanan falsely reported that all the 15-minute prisoner safety checks were completed for his courtroom and filed a supplemental report on May 10, 2017, "without having it reviewed and signed by a supervisor."

¶ 5      The Sheriff alleged that Deputy Buchanan (1) "was, at a minimum, grossly negligent in his duties when he failed to properly supervise the prisoners in his custody," "when he failed to properly conduct 15-minute prisoner safety checks," and when he "failed to properly supervise the two male prisoners who sexually assaulted a female prisoner in another cell, restroom cell 106, one after the other," and (2) "failed to be alert, attentive and vigilant and [Deputy Buchanan's] inattention to duty led to the sexual assault of a female prisoner in restroom cell 106 by two male prisoners in his custody."

¶ 6      Deputy Buchanan's case was consolidated for a hearing before the Board with cases filed against the three other deputy sheriffs assigned to courtrooms 105 and 106 on May 2, 2017—Deputy Josephine Carter, Deputy Sheila Kalina, and Deputy Timothy Houlihan (collectively, the respondent deputies).

¶ 7                     B. The Merit Board Hearing

¶ 8     Commissioner James Nally, chair of the Merit Board, presided over the hearing. The evidence presented at the hearing in these consolidated cases showed that courtrooms 105 and 106 at the Markham Courthouse are connected by a hallway with a holding cell and restroom cell for each courtroom. Holding cells 105 and 106 are on one side of the hallway and have large picture windows facing the hallway. The restroom cells on the other side of the hallway have only a small window on the cell door. Male detainees are generally kept in the holding cells while they are waiting to be called for court. Female detainees are generally kept separately in a restroom cell. There is one set of keys per courtroom, but those keys are identical and open any of the four cells assigned to the two courtrooms. Each courtroom is assigned a male and a female deputy. On May 2, 2017, Deputies Buchanan (male) and Carter (female) were assigned to courtroom 105, while Deputies Houlihan (male) and Kalina (female) were assigned to courtroom 106.

¶ 9     On May 2, 2017, a female detainee, B.D., was assigned to courtroom 106 and was kept in restroom cell 106 when she was not before the judge. She was brought upstairs from the main lockup by Deputy Kalina at approximately 10:45 a.m., briefly went before the judge shortly after that, and was then returned to restroom cell 106 by Deputies Kalina and Houlihan. Deputy Kalina then brought B.D. back down to the main lockup area at around 1:45 p.m. or 1:50 p.m. At some point, two male detainees from courtroom 105—Nelon Drake and Hamidullah Tribble—were apparently allowed to enter restroom cell 106 while B.D. was still inside. Deputy Kalina acknowledged that she put B.D. in the restroom cell. There was some evidence that Deputy Houlihan put at least one of the male detainees into that cell. There was no evidence that Deputy Buchanan put any of the three detainees into that cell.

¶ 10                               1. The Audio-Recorded Interviews

¶ 11    The Sheriff's case before the Board consisted in large part of the audio recordings made by the Office of Professional Review (OPR) of interviews with each of the four respondent deputies. We summarize those interviews as follows.

¶ 12                               a. The Courtroom 105 Deputies

¶ 13    Deputy Buchanan had worked for Court Services for only several months, but Deputy Carter had been there for almost 20 years. They had worked together for approximately one month.

¶ 14    On May 2, 2017, courtroom 105 was assigned 10 to 13 detainees, including Mr. Drake and Mr. Tribble. Deputy Buchanan brought them up from lockup at approximately 9:30 a.m. or 9:45 a.m. and secured them in holding cell 105. When asked whether a female detainee was assigned to courtroom 105 that day, Deputy Buchanan could not recall, but Deputy Carter answered no. Deputy Buchanan, who was primarily responsible for moving the male detainees, generally kept the keys for courtroom 105, which usually had more male than female detainees.

¶ 15    The deputies agreed that they were generally responsible for the detainees assigned to their courtroom. Deputy Carter acknowledged that she had initialed each 15-minute check on the prisoner safety check form from May 2, 2017. She explained that "with every partner [she] ever had," the way the safety checks were conducted was that her male colleague would check the male detainees and let her know that "it's okay," and she would write that down. Although she was mostly in the courtroom that day, while Deputy Buchanan was back and forth between the courtroom and the lockup area, Deputy Carter had a full view of the male detainees when the door from the courtroom to the lockup area was open. Deputy Buchanan agreed that Deputy Carter may have completed the paperwork for the checks that day, but he was "in and out of there grabbing inmates." When asked if he was the one "conducting the 15-minute checks, ensuring that your

prisoners are okay, there's no issue with it—with your prisoners," Deputy Buchanan responded, "[y]es, but [Deputy Carter] does checks also." Between the two of them, he said, "yes [they did] 15-minute checks."

¶ 16    Deputy Buchanan received a phone call from Deputy Kalina between 12:45 p.m. and 1 p.m., while he and Deputy Carter were sitting in the breakroom. Deputy Kalina told him in that call to get his male detainee out of restroom cell 106. He and Deputy Carter could not understand why she had called them when neither of them had put the detainee there.

¶ 17    In response to the call, Deputy Buchanan immediately retrieved the detainee, who he believed was Mr. Drake, from the restroom cell. Mr. Drake was standing at the doorway and Deputy Buchanan opened the door enough to let him out—though not enough to see inside the cell—closed and locked the door, took Mr. Drake to holding cell 105, and returned to the breakroom. Mr. Drake did not say anything to him at that time, and Deputy Buchanan had no idea there was a female detainee inside the cell.

¶ 18    Mr. Tribble was in holding cell 105 when Deputy Buchanan returned Mr. Drake to that cell. Deputy Buchanan said he did not see Mr. Tribble in restroom cell 106 at any time. Both courtroom 105 deputies told the investigator that neither of them moved Mr. Drake or Mr. Tribble to restroom cell 106 that day. Deputy Buchanan did not know how his detainees got into restroom cell 106. He said it was possible that the deputies from courtroom 106 allowed the courtroom 105 detainees to use their restroom cell because "sometimes [detainees] are moved by other deputies to use the facility."

¶ 19    Deputy Carter said in her interview that she did not learn that a female detainee had been assigned to courtroom 106 until approximately 10 minutes after Deputy Buchanan received the phone call from Deputy Kalina. It was then that Deputy Carter saw the female detainee "pop[ ] up

at the door" of restroom cell 106 and ask when she was going downstairs. Deputy Carter let Deputy Kalina know that she had a female detainee who wanted to go downstairs. Deputy Carter did not immediately conclude that a male detainee and a female detainee had been in the restroom cell together—even though Deputy Buchanan had recently removed Mr. Drake from there—because Deputy Kalina could have put a female detainee in the restroom cell after Deputy Buchanan had removed Mr. Drake at Deputy Kalina's request.

¶ 20     Deputy Buchanan said that when he opened holding cell 105 to take their detainees back downstairs (at approximately 1:45 p.m., according to the prisoner safety check form), Mr. Drake and Mr. Tribble approached him, asking to speak with a sergeant, and he took them to see Sergeant Garrett. The two reported to Sergeant Garrett that they had been raped. Deputy Buchanan was directed to file a written report regarding this incident. He wrote two offense/incident reports on May 2, 2017, explaining in his interview that the second one was a corrected report. In that corrected report, he made a few small changes and included a slightly longer narrative. According to the reports, both were completed at 2:20 p.m., but the first one was approved at 2:50 p.m. while the second was approved at 3 p.m.

¶ 21     In the narrative section of his May 2, 2017, corrected report, Deputy Buchanan wrote:

    "On above date at approximately 1330 Hrs, Inmates Drake, [Nelon] ***, and Tribble, Hamidullah *** was [*sic*] being escorted down from court room 105 to the male lockup by R/D. Inmate Drake asked to speak with a sergeant. *** Upon arriving to male lock up, Drake asked to speak with Sgt. Garrett ***. Drake and Tribble alleged that they were raped by female inmate [B.D.], in the holding cell behind court room #106. At no time did R/D place or have knowledge of any one else placing female and male inmates together."

¶ 22    Eight days later, on May 10, 2017, Deputy Buchanan completed a supplemental report. In the narrative section of that report, he stated:

"When all court calls were completed *** I DS Buchanan answered the telephone, and was told by DS Kalina to take my male prisoner out of her bathroom. DS Carter responded why cant [*sic*] she take him out, I said its ok I will go ***. when I arrived inmate Drake was standing by the door looking out of the window. I let him out and returned him to 105 prisoner lock up, and ten minutes later transported the inmates to lock up."

¶ 23    Deputy Buchanan explained in his OPR interview that he did not recall the phone call from Deputy Kalina when he filed his initial and corrected reports on May 2, 2017. On May 3, he told another deputy, Deputy Hart, that he had additional information to add to his report and was told to "hurry up and get it in." Deputy Buchanan tried to do this but had trouble finding someone who could show him how. On May 10, 2017, he found the supplemental report form on the computer and filled it out. He turned it in the next day to the investigators from the Cook County State's Attorney's Office (SAO) who had asked him for it. Deputy Buchanan did not realize he had gone around the chain of command by failing to give the supplemental report to his supervisor first. He also told the investigator that this was "the first time that [he had] ever had to generate a report."

¶ 24    Deputy Carter confirmed that Deputy Buchanan was trying to fill out the supplemental report but "never could get time to get to the computer." She filled out her own report the day after the incident but did not mention the phone call. She had forgotten about it until several days later when Deputy Buchanan reminded her of it.

¶ 25    Deputy Carter acknowledged she could not know for sure that Deputy Buchanan did not put their detainees in restroom cell 106. She did not believe he would have done so, however, when their own restroom cell was empty. Deputy Carter explained that she was the one who trained

7

Deputy Buchanan on courtroom procedures, and he "never made a move" without checking with her first. Deputy Carter had specifically told him never to move a detainee without permission because you could never know who might be in the other courtroom.

¶ 26                              b. The Courtroom 106 Deputies

¶ 27    On May 2, 2017, Deputies Kalina and Houlihan were responsible for nine male detainees and one female detainee (B.D.) in courtroom 106. According to Deputy Houlihan, B.D. went before the judge sometime between 11 a.m. and 11:15 a.m. and was there for less than five minutes. The deputies then walked her back to restroom cell 106, Deputy Houlihan locked the door, and they both returned to the courtroom. Deputy Kalina physically checked restroom cell 106 that day, though she could not recall what time she did this, and saw B.D. sleeping. No male detainees were present. Deputy Kalina took B.D. back downstairs at approximately 1:45 p.m., and B.D. did not say anything to her at that time about male detainees being in her cell.

¶ 28    The courtroom 106 deputies used the same procedure to do their 15-minute checks as the courtroom 105 deputies—Deputy Houlihan went back and forth into the lockup and let Deputy Kalina know that everything was okay. She then initialed the safety checks sheet. Deputy Kalina, who had worked at the Markham Courthouse since 1998, said that was how it worked in most of the courtrooms. When Deputy Houlihan went to lunch, however, she completed the safety checks herself. That day, Deputy Houlihan was on a lunch break from approximately 12:20 to 1:15 p.m.

¶ 29                                   2. Eyman Zabadneh

¶ 30    The Sheriff called Eyman Zabadneh, the OPR's primary investigator into this matter. He reviewed the offense/incident report, supplemental reports filed by the respondent deputies and two other deputies, and other documents for the courtrooms involved. His investigation was administrative in nature, but the SAO also conducted a criminal investigation into the alleged

sexual assault. Mr. Zabadneh reviewed the interviews conducted by the SAO investigators, and the SAO reports were admitted to show his course of conduct in his investigation.

¶ 31    Mr. Zabadneh interviewed three detainees from courtroom 106—Tyres Barnes, Ivory King, and Joaquin Hermenjildo. According to Mr. Zabadneh, these three detainees all implicated Deputy Houlihan as putting a male detainee into restroom cell 106, though Mr. Hermenjildo did so only indirectly, by describing the deputy as a white male. Mr. Zabadneh explained that Deputies Buchanan and Carter are African American and that Deputies Houlihan and Kalina are white.

¶ 32    Mr. Zabadneh said that Deputy Buchanan "basically failed to follow" the reporting requirement under Cook County Court Services Department Policy Manual Policy (hereinafter, Court Services Policy or Policy) 903.9 when he supplemented his report eight days after the incident was first reported. He believed all four respondent deputies violated Policy 900.3.3— which provides that detainees are to be segregated by gender and that all detainees are to be visually inspected as required by the prisoner safety check form—because two male detainees were in a cell with a female detainee and, according to Mr. Zabadneh, all four deputies said that the visual inspections were completed by the male deputy indicating that "everything was fine" or "everything was okay" and the female deputy filling in the sheet. Mr. Zabadneh found that Deputy Buchanan violated Policy 1100.3.8, which required all areas to be visually inspected every 15 minutes and recorded on the prisoner safety check form, because he did not personally complete a safety check form. Mr. Zabadneh also said Deputy Buchanan violated Policy 321.5.2(f) because he did not include the fact that he moved a male detainee from restroom cell 106 in his initial report and only included it in a supplemental report that he did not show to "a supervisor or anybody in the chain of command." Mr. Zabadneh testified that he was unaware of Deputy Buchanan's supplemental report until he received it as part of the SAO investigation report. Mr. Zabadneh also

testified—without any explanation—that the respondent deputies violated Court Services Policy 321.5.5(a), (c), (e), (l), (m), (ac), and (ad).

¶ 33                                    3. Deputy Gregory Hart

¶ 34    Deputy Hart testified that on May 2, 2017, he and Sergeant Garrett took statements from Mr. Drake and Mr. Tribble about their allegations that "the lady upstairs raped [them]." According to his reports, which were objected to but admitted by Commissioner Nally "not necessarily for the truth of the matter asserted," Mr. Drake said that Deputy Kalina put him in restroom cell 106 and he was not sure which deputy took him out. Mr. Tribble said Deputy Houlihan put him in restroom cell 106 and Deputy Kalina removed him and returned him to holding cell 105.

¶ 35    Deputy Hart also testified that he had discussed with Deputy Buchanan the phone call Deputy Buchanan received in the breakroom from Deputy Kalina and had told him to report it.

¶ 36                            4. The Respondent Deputies' Testimony

¶ 37    At the hearing, counsel for Deputy Kalina stipulated that, if called, she would testify consistently with her recorded interview. Deputies Carter and Houlihan did testify, and their testimony was largely consistent with their recorded interviews. Deputy Buchanan also testified, and we will review that testimony to the extent it supplements his recorded interview.

¶ 38    Deputy Buchanan testified that he was 61 years old, had grown up in Chicago, and served in the National Guard (on both a full-time and a part-time basis) from 1979 to 2013. He started working for the Cook County Department of Corrections (CCDOC) in 1998 and had received commendations as a drill instructor and for writing training materials. Deputy Buchanan was a platoon sergeant in Afghanistan in 2008. Although he had been diagnosed with and was being treated for post-traumatic stress disorder, he said that it did not interfere with his work at CCDOC.

¶ 39    Deputy Buchanan testified that in 2016 he moved, within the Sheriff's office, from

CCDOC to Court Services because he wanted to be closer to home when his wife was diagnosed with cancer. On May 2, 2017, he was on a permanent assignment to courtroom 105, where he had been for approximately 2 ½ or 3 months.

¶ 40    Deputy Buchanan testified that he did not allow two male detainees to be in the same cell as a female detainee on May 2, 2017.

¶ 41                                            5. Ivory King

¶ 42    Ivory King, a prisoner at Sheridan Correctional Center, testified that he was a detainee at the Markham Courthouse on May 2, 2017. The prisoner disposition sheet showed he was assigned to courtroom 106. Mr. King testified that "a couple minutes" after he was brought to the holding cell, he saw an older Black woman being put in the small cell. Ten or fifteen minutes later, a deputy, who Mr. King described as "white, bald head with glasses," put a male detainee from the other courtroom in that cell, and Mr. King did not see anyone take the female detainee out first. Mr. King said the deputy did not check first to see if anyone was in the restroom cell.

¶ 43                          C. The Merit Board's Initial Decision

¶ 44    On October 25, 2019, the Merit Board issued its written decision terminating Deputy Buchanan, effective November 22, 2017. The Board found that Deputy Buchanan violated several policies. The Board concluded:

> "[Deputy Buchanan] was grossly negligent in allowing the female detainee [B.D.] to be assaulted in restroom cell 106 by the male detainees by failing to properly monitor the courtroom holding cells, failing to properly inspect the cells for the 15 minute checks by entering the cells and checking the occupancy, falsely claiming that the 15 minute checks were properly done, and failing to properly monitor the detainees under his supervision. Further [Deputy Buchanan] falsely filed reports that he complied with the requirements to

11

conduct proper safety checks and was untruthful to OPR investigators regarding the circumstances surrounding the incident. [Deputy Buchanan] failed to be alert and attentive and vigilant in his duties which led to the sexual assault of the detainee."

¶ 45                                    D. Circuit Court Proceedings

¶ 46    Deputy Buchanan filed a complaint for administrative review in the circuit court, alleging, in part, that the Merit Board's findings were against the manifest weight of the evidence.

¶ 47    After a hearing on July 13, 2021, the circuit court issued a written order remanding the case for the Board to clarify "whether its findings of fact provided a sufficient basis to conclude that cause existed to discharge Marvin Buchanan due to his conduct and whether said specified conduct rendered Marvin Buchanan's continued employment in some way detrimental to the discipline and efficiency of the Cook County Sheriff's Office." The Board was further instructed to set forth any mitigating factors and the weight that was given to the evidence supporting those factors.

¶ 48                                    E. The Second Board Decision

¶ 49    The Board issued a second decision on October 14, 2021. That decision briefly summarized the evidence and its first decision. The second decision focused on the Board's belief that Deputy Buchanan's conduct "led to the sexual assault of the detainee." The Board said on remand:

"Marvin Buchanan's conduct clearly warrants termination in this case. All members of the Sheriff's Office are familiar with zero tolerance of acts committed in which the act committed is grounds for termination. This was a termination case as noted in the original complaint. The Merit Board agrees in this case that never at any time this type of conduct should not result in termination. [*sic*] The testimony and evidence presented in this case clearly shows termination is reasonable based on the act that occurred."

¶ 50    The Board went on to note that although Deputy Buchanan had no "complaints on his

12

disciplinary history," that did not "outweigh the seriousness of his misconduct in this case." The Board ultimately found that Deputy Buchanan's "misconduct is incompatible with continued service as a deputy sheriff and warrants discharge" and that his continued employment would be "detrimental to the Cook County Sheriff's Office based on his actions in this case."

¶ 51    The Board also terminated the other three deputies. The terminations of Deputy Carter and Deputy Kalina were affirmed by the circuit court, and then again by this court. *Carter v. Dart*, 2022 IL App (1st) 201188-U; *Kalina v Cook County*, 2021 IL App (1st) 210102-U. According to the clerk of the circuit court's online docket, the circuit court found in favor of Deputy Houlihan on administrative review and remanded his case to the Board (*Houlihan v. Cook County*, No. 19-CH-12698 (Cir. Ct. Cook County, Nov. 4. 2020)).

¶ 52    The circuit court affirmed the Board's decision to terminate Deputy Buchanan on February 16, 2022. This appeal followed.

¶ 53                                    II. JURISDICTION

¶ 54    The circuit court affirmed the Board's decision on February 16, 2022. Deputy Buchanan timely filed a notice of appeal from that decision on March 9, 2022. This court has jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 55                                    III. ANALYSIS

¶ 56    Review of an administrative agency's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). When an appeal is from the circuit court's decision on a complaint for administrative review, we review the administrative decision rather than the decision of the circuit court. *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 34. Our standard of review depends on the nature of the question presented. *AFM Messenger Service, Inc. v.*

13

*Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). We review questions of law *de novo* (*id.*), we defer to an agency's factual findings unless they are against the manifest weight of the evidence (*City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998)), and we review mixed questions of law and fact for clear error (*AFM*, 198 Ill. 2d at 391).

¶ 57     On review of an administrative agency's decision to discharge an employee, the scope of our review involves a two-step process: first, we determine whether the agency's findings of fact are contrary to the manifest weight of the evidence, and then we determine whether those findings of fact provide a sufficient basis for its conclusion that there was cause for the discharge. *Marzano v. Cook County Sheriff's Merit Board*, 396 Ill. App. 3d 442, 446 (2009).

¶ 58     A. The Board's Stated Basis for Termination Was Unsupported by the Evidence

¶ 59     Deputy Buchanan argues on appeal that the "linchpin of the Merit Board's order to fire [him] is that he allowed the sexual assault" of a female detainee, but there was no evidence to support that a sexual assault occurred. We agree. Moreover, we find that there was no evidence that connected any of Deputy Buchanan's conduct to a situation in which a female detainee was alone and unsupervised in a cell with a male detainee, thus providing an opportunity for such an assault to occur.

¶ 60     It is clear, particularly after the remand by the circuit court in this case, that the Board's basis for terminating Deputy Buchanan was the occurrence of what it believed was a sexual assault in restroom cell 106. The sexual assault was a focus of the Sheriff's complaint, which alleged that Deputy Buchanan "failed to properly supervise the two male prisoners who sexually assaulted a female prisoner in another cell" and that his "inattention to duty led to the sexual assault of a female prisoner in restroom cell 106 by two male prisoners in his custody." The sexual assault also featured prominently in the Board's first decision, where the Board concluded that Deputy

14

Buchanan "was grossly negligent *in allowing the female detainee [B.D.] to be assaulted* in restroom cell 106 by the male detainees." (Emphasis added.) The Board also listed in its first decision a variety of policies that it found Deputy Buchanan had violated.

¶ 61    The circuit court in this case remanded because, in its view, the Board's reasons for terminating Deputy Buchanan were not clearly identified. In response, in its second decision, the Board clarified that "[t]he testimony and evidence presented in this case clearly show termination is reasonable *based on the act that occurred*." (Emphasis added.) The "act that occurred" appears to be a reference to the finding in the previous paragraph that Deputy Buchanan's conduct resulted in "allowing the female detainee [B.D.] to be assaulted in restroom cell 106 by the male detainees." The Board went on to conclude that Deputy Buchanan's "years of service and accomplishments do not outweigh the seriousness of the misconduct in this case."

¶ 62    There can be no question that a sexual assault of a female detainee by two male detainees is extremely serious. However, in this case the Board was not presented with evidence that this had occurred. The three parties purportedly involved—Mr. Drake, Mr. Tribble, and B.D.—did not testify, and no witnesses to a sexual assault were presented. B.D. gave a statement to the SAO that was included in the SAO reports, but those reports were admitted only to show Mr. Zabadneh's course of conduct, not for the truth of any matter asserted in them. The most direct testimony presented about the occurrence of a sexual assault came from Deputy Hart, who testified to the statements he took from Mr. Drake and Mr. Tribble on the day of the incident, in which they accused B.D. of sexually assaulting *them*. And Commissioner Nally had ruled that testimony was "not necessarily for the truth of the matter asserted."

¶ 63    The most that can be said is that the evidence showed there was an *opportunity* for a sexual assault to occur. Taken as true, Mr. King's testimony—that he saw a white, male deputy place a

male detainee in the cell where a female detainee had been placed—supports the conclusion that a male detainee and a female detainee were unsupervised in a restroom cell at the same time.

¶ 64    The opportunity for a male detainee to assault a female detainee is, of course, also serious, and we do not dispute the Sheriff's interest in preventing such occurrences. But even if we were to read the Board decision broadly—that its termination of Deputy Buchanan was based on his conduct creating this opportunity for a sexual assault to occur—there was also no evidence that any of Deputy Buchanan's conduct contributed to that opportunity.

¶ 65    Notably, there was no evidence that Deputy Buchanan put any of the three detainees into the restroom cell. It was undisputed that Deputy Kalina put B.D. in restroom cell 106. The only deputy identified as having put a male detainee in that cell by direct testimony at the hearing was a deputy who was "white, bald head with glasses," and it is undisputed that Deputy Buchanan is African American. Deputies Houlihan and Kalina were also identified as having put a male detainee into restroom cell 106 by hearsay evidence, such as the statements that Mr. Drake and Mr. Tribble gave to Deputy Hart or Mr. Zabadneh's testimony about interviews with other detainees during his investigation.

¶ 66    There is also no basis for finding that Deputy Buchanan engaged in other misconduct or neglect of his duties that gave rise to the female and male detainees being left together and unsupervised in the restroom cell of courtroom 106. As we discuss in more detail below, there is simply no evidence that Deputy Buchanan violated the policy on 15-minute checks. And while Deputy Buchanan omitted from his initial and corrected reports both the phone call he received from Deputy Kalina and the fact that he removed Mr. Drake from the bathroom—instead reporting those facts eight days later in his supplemental report—there is simply no causal connection between any flaw in Deputy Buchanan's reporting and the fact that a female and two male

16

detainees were together in the restroom cell for courtroom 106. Thus, the Board's finding that Deputy Buchanan's conduct caused a sexual assault or even an opportunity for a sexual assault to occur is against the manifest weight of the evidence and cannot serve as a basis for his termination.

¶ 67                    B. The Evidence Does Not Support an Alternate Basis for Termination

¶ 68    The Sheriff does not dispute that the record contains no competent evidence of a sexual assault but contends that "none of the charges against Buchanan required a finding of a sexual assault." The Sheriff argues that we may affirm the Board's decision simply on its finding that Deputy Buchanan's actions violated other policies. In response, Deputy Buchanan argues that the Board was explicit as to its rationale for terminating him and contends that we "may not affirm an agency's decision on grounds other than those relied on by the agency." As support for this assertion, he cites our supreme court's decision in *Board of Education of the City of Chicago v. Moore*, 2021 IL 125785. We need not decide here whether we could affirm the Board's decision on an alternate basis. We have reviewed the Sheriff's arguments regarding the alleged policy violations and, on this record, we find no evidence to support the Board's finding that Deputy Buchanan violated those policies.

¶ 69    The Sheriff first points to the Board's finding that Deputy Buchanan violated the reporting requirements in Policies 321.5.2(f) and 903.9(a). Policy 321.5.2(f) states that employees will be disciplined for failing to report activities "where such activities may result in criminal prosecution or discipline under this policy," and Policy 903.9(a) requires a report of "known or suspected sexual conduct among subjects" "as soon as practicable through the chain of command." The Sheriff argues that the Board was correct in finding violations of these policies because Deputy Buchanan "failed to include vital information in his supplemental incident report," including that he received the phone call from Deputy Kalina and that he removed Mr. Drake from restroom cell

17

106 approximately 10 minutes before Mr. Drake reported being sexually assaulted in that cell.

¶ 70     This argument is confusing since there is no dispute that this information was *indeed* included in the *supplemental* report Deputy Buchanan completed eight days after the incident. We assume the Sheriff is really arguing that this information was not included in the initial and corrected reports that Deputy Buchanan filed on the day of the incident. However, it was in those reports, which were filed immediately and through the chain of command, that Deputy Buchanan reported the suspected sexual conduct among the detainees and the activities that could result in criminal prosecution or discipline, fully in compliance with both reporting policies.

¶ 71     Deputy Buchanan then completed a supplemental report eight days later which, as the Sheriff points out, he sent to the SAO investigators rather than through his chain of command. In that supplemental report, Deputy Buchanan disclosed the phone call from Deputy Kalina and that he had removed Mr. Drake from the restroom cell. By completing his supplemental report, Deputy Buchanan complied with Policy 321.5.2(f)—he reported activity that may result in discipline under the policy. In contrast to Policy 321.5.2(f), Policy 903.9(a) requires that a report be filed "as soon as practicable" and "through the chain of command." And while this supplemental report was arguably not filed as soon as practicable or through the chain of command, the facts reported there are not of "known or suspected sexual conduct among subjects," which is the only information that is required to be reported under Policy 903.9(a). The sexual conduct that Deputy Buchanan knew of was reported immediately and any delay in filing the supplemental report does not support the Board's finding that he violated either of the reporting policies that the Sheriff cites.

¶ 72     According to the Sheriff, the evidence also shows that Deputy Buchanan violated Policies 900.3.3(b) and 1100.3.8. Policy 900.3.3(b) requires that "[a]ll detainees shall be visually inspected by sworn personnel as required by the Prisoner Safety Check Policy. This check shall be recorded

18

on the Prisoner Safety Check Form [actually titled 'Prisoner Safety Check Sheet'] along with any pertinent comments." Policy 1100.3.8 similarly requires that "[a]ll holding areas shall be subject to continual monitoring with visual inspection every 15 minutes at a minimum, and recorded on the Prisoner Safety Check Form."

¶ 73    Contrary to the Sheriff's position, there was no evidence that Deputy Buchanan failed to properly complete these visual inspections. All four respondent deputies testified that the way the inspections were done at the Markham Courthouse was that the male deputy—who frequently brought detainees between lockup and the courtroom—would do the inspection when they were in the lockup area and let the female deputy know that there were no issues, and the female deputy would then initial the prisoner safety check form. Although Deputy Buchanan had only worked at the Markham Courthouse for a short time, the other three deputies had worked there for years and said the inspections had always been done that way.

¶ 74    While Mr. Zabadneh and the Board both implied that Deputy Buchanan was required to fill out the prisoner safety check form himself, rather than in tandem with his partner, there is nothing in the policy language to support that. At oral argument, counsel for the Sheriff suggested that the form itself mandated that each deputy fill it out independently. But the form says nothing about how it is to be filled out. It simply has boxes with times listed for every 15 minutes, a space for initials, and another space for comments.

¶ 75    Counsel for the Sheriff also suggested during oral argument that the policies required each deputy to know where each of the detainees was at any given time. There is certainly some logic to expecting a deputy to know exactly where his or her detainees are throughout the time that the detainees are in the courtroom lockup area, or at least where each detainee is at the time of each 15-minute inspection. Indeed, Deputy Buchanan answered "[y]es" to the question by Mr.

19

Zabadneh, "[w]ouldn't you know where your prisoners are at all times every 15 minutes?" However, again, the policies that the Sheriff has pointed to simply do not say that this was a requirement and there was no testimony from anyone that any policy required the deputies to account for each of their detainees at all times or at each of these visual inspections.

¶ 76 The Board's conclusion that Deputy Buchanan violated these policies was, accordingly, against the manifest weight of the evidence.

¶ 77 The Sheriff argues that the evidence shows Deputy Buchanan violated subsections (a) and (c) of Court Services Policy 321.5.5, which provide that an employee will be disciplined for a "[f]ailure to remain alert and vigilant, consistent with assigned duties (*e.g. failure to answer radio and/or telephone calls*)" (emphasis added) and for "[u]nsatisfactory work performance including, but not limited to failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or instructions of supervisors." No evidence suggested Deputy Buchanan failed to answer any radio or telephone call or failed to carry out proper orders or instructions of his supervisors. The Sheriff argues, however, that Deputy Buchanan violated these policies because he did not know how Mr. Drake ended up in restroom cell 106 and did not inquire about how it happened. As noted above, nothing in any policy that the Sheriff has cited or that the Board relied on requires a deputy to know where every one of his detainees is at all times. The 15-minute visual inspection policy contains no requirement that deputies count their detainees or note where they are. There was simply no evidence presented that Deputy Buchanan's lack of knowledge was due to his incompetence or a lack of vigilance. The Board's conclusion that Deputy Buchanan violated these policies is against the manifest weight of the evidence.

¶ 78 We are similarly unconvinced by the Sheriff's argument that the evidence shows Deputy Buchanan violated Policy 900.3.3(a), which requires detainees to be segregated by gender. As

discussed above, there was no evidence that any of Deputy Buchanan's conduct led to a male detainee being in a cell with a female detainee.

¶ 79    In addition, the Sheriff claims that the evidence shows that Deputy Buchanan violated subsections (e), (l), (m), (ac), and (ad) of Policy 321.5.5, which prohibit an employee from "[c]oncealing, attempting to conceal, removing or destroying defective or incompetent work"; "[k]nowingly making any false, misleading or malicious statement that may harm or destroy the reputation, authority or official standing of the" Sheriff's office; "falsif[ying] *** any work related records, the making of misleading entries or statements with the intent to deceive"; "[f]ail[ing] to disclose or misrepresenting material facts, or the making of any false or misleading statement"; and "[g]iving any false or misleading statement, or misrepresenting or omitting material information, to a supervisor or other person in a position of authority" in "the course of any work-related investigation."

¶ 80    The Sheriff's argument is based on Deputy Buchanan's delay in filing his supplemental report and his testimony about the 15-minute checks. The evidence does not support a finding that Deputy Buchanan falsified records or covered up his conduct on either basis. The Sheriff argues that Deputy Buchanan "attempt[ed] to conceal his misleading" initial offense/incident report by "circumventing his chain of command" and giving his supplemental report directly to the SAO investigators. But there was no evidence that Deputy Buchanan intentionally omitted the phone call from his first report. Deputy Buchanan explained that he did not think about the phone call until the following day, and this is further supported by the fact that Deputy Carter also said she did not remember the phone call until Deputy Buchanan reminded her of it a few days later. And although Deputy Buchanan did not file the supplemental report through the proper chain of command, he explained that he had never filed a report before and that he gave it to the SAO

21

investigators who had asked for it. No evidence to the contrary was presented, and none of the evidence supports the conclusion that Deputy Buchanan gave his report to the SAO to conceal incompetent work or misconduct on his part.

¶ 81    The Sheriff also argues that the evidence shows that Deputy Buchanan "lied to OPR investigators regarding the circumstances surrounding the alleged sexual assault, by stating that he properly completed his 15-minute checks." But there is simply no evidence that Deputy Buchanan lied. He and Deputy Carter consistently testified about the procedure they used for the 15-minute inspections, and no evidence was presented to contradict them. The Board's findings that Deputy Buchanan violated Policy 321.5.5 were also against the manifest weight of the evidence.

¶ 82    Finally, because we find no evidence to support the Board's finding that Deputy Buchanan violated any of these policies, there is no support for the Board's finding that Deputy Buchanan violated article X. That article provides that an employee will be disciplined if they "violate any of the general orders, special orders, directives, or rules and regulations of this Cook County Sheriff's Department."

¶ 83    The first step in our review of a discharge decision is determining whether the evidence supports the finding of misconduct that the Board relied on as its reason for discharge. *Marzano*, 396 Ill. App. 3d at 446. We find that here it does not. The basis that the Board gave for this termination—that Deputy Buchanan's conduct led to the assault of a female detainee—is not supported either by evidence that such an assault occurred or even by evidence that Deputy Buchanan's conduct contributed to a situation where an assault could occur. And, furthermore, the Board's finding that Deputy Buchanan violated certain policies is also unsupported by the evidence. Because the evidence does not support the Board's finding of misconduct, there can be no basis for the discharge. Accordingly, Deputy Buchanan's termination is reversed.

22

¶ 84                              IV. CONCLUSION

¶ 85    For the foregoing reasons, we reverse the decision of the Board terminating Deputy Buchanan and the circuit court judgment upholding his termination. This case is remanded for Deputy Buchanan's reinstatement and an appropriate award of back pay.

¶ 86    Circuit court judgment reversed.

¶ 87    Board decision reversed.

¶ 88    Cause remanded.

*Buchanan v. The Cook County Sheriff's Merit Board*, 2023 IL App (1st) 220320

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CH-13670, the Hon. Michael T. Mullen, Judge, presiding. |
| **Attorneys for Appellant:** | Joel A. Flaxman and Kenneth N. Flaxman, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein, Chief, Civil Actions Bureau, Jonathan D. Byrer, Supervisor of Civil Appeals & Special Projects, and Emily Stewart, Assistant State's Attorneys, of counsel), for the Sheriff. |