2025 IL App (1st) 231616

No. 1-23-1616

First Division
September 29, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DARRELL McDONALD, | ) | Appeal from the |
| | ) | Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOARD OF TRUSTEES OF THE FIRE | ) | No. 2022 CH 06838 |
| AND POLICE COMMISSIONERS OF THE | ) | |
| VILLAGE OF MAYWOOD, POLICE CHIEF | ) | Honorable |
| ELIJAH WILLIS, and THE VILLAGE OF | ) | Pamela McLean Meyerson |
| MAYWOOD, | ) | Judge, presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1 This case concerns proceedings related to the termination of a police officer employed by defendant-appellee, the Village of Maywood (Village). Following plaintiff-appellant, Officer Darrell[1] McDonald's arrest for domestic battery charges in October 2021, defendant-appellee,

_____

[1]McDonald's first name is spelled differently throughout the record.

Elijah Willis, Chief of Police for the Village of Maywood (Chief Willis), filed charges for termination. Rather than arbitrate his proposed termination, McDonald elected a hearing challenging those charges before defendant-appellee, the Village's Board of Police and Fire Commissioners (Board).[2] Following an agreed bifurcated hearing, the Board determined that Chief Willis had proved cause for termination and issued a final administrative decision. See 735 ILCS 5/art. 3 (West 2020).

¶ 2    McDonald appealed the decision to the circuit court of Cook County, which affirmed the decision in its entirety. Now, on appeal, McDonald raises various procedural and substantive challenges to the Board's decision. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4                              A. Prehearing Facts

¶ 5    The Village is a municipality and home-rule unit of government located in Cook County, Illinois. McDonald had been a police officer within the Maywood Police Department (department) since 2013 or 2014. There is no dispute that McDonald was a member of a collective bargaining unit. The Board is constituted pursuant to the Illinois Municipal Code (65 ILCS 5/1-1-1 *et seq.* (West 2020)), *et seq.* (West 2020); see also Maywood Village Code § 3-31.21 (adopted August 17, 2021) and is empowered to make rules, appointments, and removals of officers as provided for therein. See *id.* §§ 10-2.1-1 to 10-2.1-31 (West 2020); see also Maywood Village Code § 31.21 (adopted Sept. 21, 2021).

¶ 6    Maywood police officers, regardless of rank or assignment, are subject to certain rules of conduct promulgated by their department, the Board, and the Village. Specifically, the department

---

[2]Throughout the briefs and appellate record, the parties refer to the Board of Trustees as both the "Board" and the "Commission." For purposes of consistency here, we refer to it as the Board.

rules "are intended to enhance the image of the police department and its personnel by setting forth expressly prohibited acts, or violations which erode public confidence and support." The rules also dictate that "employees shall not commit or become involved in any conduct unbecoming of the employee."

¶ 7    Prior to the precipitating incident, McDonald had been disciplined by the department for a variety of infractions. In November 2014, McDonald was arrested while off-duty for domestic battery, which resulted in his termination. However, in December 2014, he was reinstated to his position. In July 2017, McDonald received a three-day suspension for insubordination. In January 2019, McDonald entered into a settlement agreement pursuant to two disciplinary infractions, where he received a four-day suspension and a two-day suspension in abeyance. In September 2019, McDonald entered into a settlement agreement where he received a 10-day suspension. In December 2020, McDonald entered into a "negotiated disciplinary settlement agreement" following an off-duty arrest for driving while under the influence, which had occurred in May 2020. The settlement indicated that McDonald would receive a 20-day suspension, a 12-month "probationary status," and an agreement to attend the Village employee assistance program (EAP).

¶ 8    On October 5, 2021, while off-duty, McDonald was arrested in Hanover Park, Illinois, following two 911 calls. Hanover Park Police Officer Shaun Paup was dispatched to an apartment where he encountered McDonald, a woman named Sheena[3] Nolan, and her two children. McDonald was arrested and charged with domestic battery while making physical contact (720 ILCS 5/12-3.2(a)(2) (West 2020)), domestic battery causing bodily harm (*id.* § 12-3.2(a)(1)), and

---

[3]Nolan's first name is spelled in at least two different ways throughout the record.

interfering with the reporting of domestic violence (720 ILCS 5/*id.* § 12-3.5(a)). A misdemeanor complaint was subsequently filed against McDonald in Du Page County.

¶ 9    On January 27, 2022, the Du Page County circuit court entered an order in McDonald's criminal case, which indicated that the Du Page County State's Attorney's Office had *nolle prossed* the charges after the complaining witness failed to appear and the State's motion for a continuance had been denied.

¶ 10                              B. Board Proceedings

¶ 11                                 1. Charges

¶ 12    On October 21, 2021,[4] Chief Willis, through counsel, signed a four-count complaint before the Board to discharge McDonald from his position. He further requested a hearing and/or summary discharge or, if applicable, an arbitration hearing to sustain McDonald's discharge. The charges referenced McDonald's recent arrest, and noted that, pursuant to the 2020 settlement agreement, McDonald was on probationary status.

¶ 13    Charge one alleged violation of chapter 14, section 2.3, of the department's policy manual, for "conduct unbecoming a police officer." Charge two alleged violation of federal and state laws, as well as chapter 14, section 1.2, of the policy manual; section 14 of the Board's rules; and Village ordinances, which require obedience to laws. Charge three, which attached McDonald's prior disciplinary history, alleged that McDonald had proven to be an "unacceptable officer whose continued employment [was] deemed detrimental" to the department. Charge four alleged that

---

[4]Although the charges are signed and dated October 2, 2021, the Board's final order indicates that the Board filed the charges on November 1, 2021. Per Board rules, the filing date of the charges is the date they were received in the Board's office.

McDonald was subject to summary discharge based on his probationary status pursuant to chapter 6, section g, of the Board's rules.

¶ 14                                   2. Prehearing Matters

¶ 15     On November 12, 2021, the Board, with notice to the parties, set a hearing on the charges for November 29, 2021, and issued subpoenas on behalf of Chief Willis to Nolan and Officer Paup to appear. Prior to the hearing, Chief Willis filed a motion for summary termination pursuant to the 2020 disciplinary settlement agreement. For his part, McDonald filed a motion to dismiss, as well as a motion to establish burden of proof.

¶ 16     Although the hearing commenced on November 29, 2021, witness testimony did not begin until February 8, 2022. Significantly, on December 21, 2021, counsel for Chief Willis sent a letter to McDonald's counsel, indicating that Chief Willis intended to call the following witnesses: Nolan, Officer Paup, and Commander Theodore Yancy of the Maywood Police Department, as well as Chief Willis. On February 9, 2022, Commander Yancy sent an e-mail to McDonald that attached Chief Willis's "Notice and Admonition." The notice indicated that Chief Willis had the right to call McDonald as an adverse witness at the hearing and that McDonald was to report to the Maywood Police Department on February 15, 2022.[5]

¶ 17                                   3. Board Hearing

¶ 18     This bifurcated hearing occurred over a period of five days. To the extent possible, and in the interest of brevity, we have attempted to recite only so much of the facts and testimony as is necessary for our analysis of the issues presented here on appeal.

---

[5]McDonald first testified during the liability phase of the proceeding on February 15, 2022.

¶ 19                              a. Hearing Day 1

¶ 20    Hearing in this matter commenced before the Board on November 29, 2021. McDonald was not present. The hearing officer indicated that he had spoken off the record with counsel for both sides, who had determined that they were not prepared to move forward that day and otherwise agreed to waive a 30-day requirement to conduct the hearing.

¶ 21    Counsel for the Board renewed the motion for summary termination. McDonald's counsel in turn argued that the correct standard for termination was "just cause" pursuant to the collective bargaining agreement (CBA). The Board took the motion for summary termination under advisement and indicated that it would rule on it following testimony.

¶ 22                              b. Hearing Day 2

¶ 23    Proceedings resumed on January 11, 2022. By agreement of the parties, the matter was again continued pending possible disposition of McDonald's criminal case. The hearing officer indicated that McDonald was "waiving" any "jurisdictional issues," in that, by agreeing to continue the hearing, he could not make any argument as to whether the Board lost its jurisdiction or ability to conduct further proceedings.

¶ 24                              c. Hearing Day 3

¶ 25    On February 8, 2022, proceedings resumed. McDonald was not present due to hospitalization, but his counsel waived his appearance. Village counsel responded that he had recently filed an admonition to call McDonald as an adverse witness and that it was the Village's position that witness testimony should be limited given McDonald's absence.

¶ 26    The hearing officer addressed the pending motions, including McDonald's motions to establish a burden of proof and to dismiss the pending charges based on the untimely notice of the witness list as provided in the CBA, the latter of which had been filed that day. McDonald's

counsel argued that the CBA was controlling on the issue and superseded state statutes, local ordinances, or Board rules. Village counsel objected to the motion's late notice and argued that the CBA did not require that a case be dismissed simply because a witness list had not been disclosed. Counsel further noted that the case had been continued numerous times without any prejudice to McDonald. Village counsel and McDonald's counsel eventually agreed that a witness list had been sent to McDonald's counsel at least by December 21, 2021.

¶ 27   Following deliberations, the Board's hearing officer issued several oral rulings. First, the hearing officer denied McDonald's motion to dismiss. Regarding notice of witnesses, the hearing officer indicated that various subpoenas had been issued prior to the first hearing, which had been continued, thus providing notice to McDonald regarding at least two key witnesses without any surprise. Additionally, neither Chief Willis nor McDonald had to be disclosed because both were parties to the proceeding. Finally, the hearing officer noted that, by at least December 23, 2021, McDonald's counsel had received Chief Willis's witness list, which again provided sufficient notice to McDonald without any prejudice.

¶ 28   McDonald's motion to establish a burden of proof was entered and continued and would later be resolved, based "upon the nature of the proofs that the Chief provides." The hearing officer further stated that, if the Village was to prove that a criminal violation occurred, it would need to do so by clear and convincing evidence. However, if Chief Willis intended to prove that a rule violation occurred or that there was "just cause" for termination, the appropriate standard would be preponderance of the evidence. The parties then proceeded with the liability phase of the proceeding.

¶ 29   On direct examination by the Village, Officer Paup testified that he was currently a detective at the Hanover Park Police Department and had served as an officer for four and a half

years. On October 5, 2021, the date of McDonald's arrest, he had been a patrol officer, was on duty, and responded to a 911 dispatch to an apartment in Hanover Park for a domestic battery report. Two calls were received by dispatch for the same incident. One call had been made by a female, and the second call had been made by her son. At that point in time, Officer Paup had not reviewed either.

¶ 30    Officer Paup arrived on the scene and observed two women and a male outside of the residence. Officer Paup first spoke to the male, while another officer at the scene spoke to the women. The male stood at the top of the stairs outside of the apartment door and identified himself as Darrell McDonald, who Officer Paup confirmed as the subject of the 911 call. He asked McDonald what had happened, to which McDonald responded that he was "unsure." McDonald further stated that he was in a romantic relationship with one of the women who had been "argumentative" with him. During the conversation, Officer Paup observed that McDonald appeared to be under the influence of alcohol, was holding a beer, and had taken a couple sips during their conversation. Although McDonald was calm, he had "bloodshot watery" eyes, and his speech was slurred. After speaking with McDonald, Officer Paup did not believe that his description of the situation was consistent with the nature of the information he had received over dispatch.

¶ 31    Officer Paup subsequently interviewed the other individuals at the scene, one of whom was later identified as Nolan, McDonald's girlfriend. He asked her similar questions about the night's events and determined that her detailed recounting of the event was inconsistent with McDonald's version. Officer Paup asked Nolan if she intended to file charges, which she decided to do. The charges were signed and verified by him. At the time, he believed Nolan would continue with the charges. However, based on his observations of the scene, Officer Paup would have signed a

complaint regardless of Nolan's intent to do so. Officer Paup again spoke with McDonald, who continued to assert that he was "unsure" about the nature of their argument. However, McDonald continually insisted that it had not become physical. McDonald was arrested and taken to the station to be processed.

¶ 32    Officer Paup was asked about the basis of the three-count criminal complaint against McDonald. He responded that the basis of the first two counts was that Nolan, a family member or member of the household, had been held down by McDonald with both hands, resulting in a scratch on her neck. The basis for count three, interfering with the reporting of domestic violence, was that McDonald had knowingly attempted or attempted to prevent Nolan from reporting the incident by allegedly hitting her hand during her phone call with the 911 dispatcher.

¶ 33    After McDonald's arrest, Officer Paup requested a copy of the 911 dispatch recording from Du Page-Comm, the dispatcher for Hanover Park. He listened to the tape and made copies for submission. Over McDonald's counsel's hearsay objection, the 911 recordings were played at the hearing. Officer Paup identified the voices on the tapes as belonging to Nolan and McDonald.

¶ 34    Officer Paup further testified that, while at the scene, his in-car camera and vest microphone had been turned on and recorded his interview of Nolan and McDonald. Over McDonald's counsel's hearsay objection, the hearing officer determined that, although the video was likely hearsay, it was nevertheless reliable and therefore played at the hearing.

¶ 35    Officer Paup had also taken four photographs of the scratch on Nolan's neck, using a department-issued phone. Once he returned to the station, he uploaded the photographs onto a computer, transferred them onto a DVD, and submitted them to the property custodian. Village counsel moved to admit all three pieces of evidence into the record. Over the objection of

McDonald's counsel, the hearing officer indicated that he would reserve ruling on all three until after hearing Commander Yancy's testimony.

¶ 36   On cross-examination by McDonald's counsel, Officer Paup testified that his police report had noted that the 911 dispatcher call had been that a "female" was "fighting with someone" and that "hands were put on a female." He admitted that the 911 call had used "vague, general language" and that his report had not stated that McDonald had spoken with slurred speech or had bloodshot eyes.

¶ 37   At the scene, another officer first spoke with Nolan and her daughter, Kiela Jackson, while Officer Paup spoke with McDonald. During his discussion with McDonald, the two stood at the top of the stairs of the apartment complex, while the other officer stood down the stairs in the driveway out of earshot. Neither officer received written statements from Nolan nor her children, and Officer Paup did not know what Nolan had said to the other officer. He was unaware that Nolan had previously filed a complaint against McDonald and had later recanted allegations in the complaint in a written statement. It would not have been important for him to have known that information at time of his investigation, as he was taking the facts as available to him.

¶ 38   Although Officer Paup had not witnessed any physical altercation between Nolan and McDonald, he had observed the "physical signs" of domestic battery. Nolan had been "agitated" and "upset" and had passionately described the night's events but otherwise did not scream or yell. Officer Paup learned from Nolan that both her children had observed a verbal argument between her and McDonald. Nolan's son had been awakened by the argument and claimed to have seen Nolan lying across the couch with McDonald on top of her, holding her down with both of his hands and knee. However, her son did not call 911. Nolan told her son that McDonald had choked her while on top of her on the couch and had pulled her braids. Officer Paup admitted that the

- 10 -

report did not indicate the manner in which Nolan had claimed McDonald had attacked her. He did not know when the scratch occurred but knew that it looked fresh. He had not observed any evidence of hair pulling and would have documented additional physical evidence if Nolan had complained of further injury. Officer Paup twice talked to McDonald, who denied engaging in battery both times. He had not observed any physical marks on McDonald and did not take photos of him. He admitted that McDonald was able to understand their conversation. Officer Paup did not enter the home for further examination.

¶ 39    On redirect examination, Officer Paup testified that he had not documented anything regarding McDonald's physical condition because there had been "nothing to document." He reiterated that the scratch on Nolan's neck had been sufficient to justify charges for domestic battery, with or without bruising. Nothing during his investigation led him to believe that Nolan was "deceptive" in her recounting of the night's events. He reiterated that Nolan had authorized him to file the complaint. He admitted that his report had included that McDonald had been arrested for domestic violence against Nolan in the past.

¶ 40    Upon Board questioning, Officer Paup testified that McDonald had an "odor of alcohol," answered a few questions with "slurred speech," and continually denied knowing why Nolan was angry or what was going on.

¶ 41                                    d. Hearing Day 4

¶ 42                            i. Commander Theodore Yancy

¶ 43    On direct examination by the Village, Commander Yancy testified that he had served in the Maywood Police Department for 27 years. His current duties as lieutenant include conducting disciplinary investigations. He had been directed by Chief Willis to investigate the circumstances of McDonald's arrest to determine if any department rules had been violated.

- 11 -

¶ 44    Commander Yancy's investigation had been procedurally standard and included a review of the totality of the available evidence. He had traveled to Hanover Park to interview all the relevant officers, had retrieved the Hanover Park police report, and had gathered and reviewed court documentation and relevant audio and video recordings. He had attempted to contact Nolan to no avail, despite numerous phone calls and stopping by her residence. However, in his review of various recordings, he had been able to identify Nolan stating twice that she wanted to file charges against McDonald.

¶ 45    Commander Yancy testified that he had reviewed the various recordings in DVD form as well as the photographs taken by Hanover Park police. Upon receipt, he made copies of everything but otherwise kept everything locked in his office. Following questioning about the chain of custody for each item, Village counsel moved to admit the 911 recordings, photographs, and the in-car video from Officer Paup's vehicle into the record. Over McDonald's counsel's hearsay objection, the hearing officer admitted the 911 recordings and the in-car video. The photographs were admitted without objection.

¶ 46    Commander Yancy testified that he was familiar with Maywood's policy manual, which prescribed a set of rules for officers when hired. The relevant rules at issue have not changed in the past nine years. Based on the review of the evidence, the policy manual, and McDonald's prior disciplinary history, Commander Yancy ultimately determined that McDonald had violated various rules of the department. Following his investigation, Commander Yancy prepared a report in which he recommended to Chief Willis that McDonald be taken before the Board for a hearing.

¶ 47    As to charge one, Commander Yancy testified that the purpose of the rule was based on the understanding that "officers were looked [at] under a microscope" and otherwise had to ensure the public trust. Employees had to follow reasonable rules of good conduct both on and off-duty.

Officers also had to ensure that their conduct was above standard and did not bring reproach, discredit, or a bad light to the department, as it would otherwise affect the Village. It was also difficult for the department when "one of [their] own" was arrested by another entity, as other departments were placed in uncomfortable situations when having to arrest someone who was also supposed to uphold the law. Regarding the charge of disobedience to laws, Commander Yancy explained that employees had to follow the general rules and regulations of the state of Illinois, the department, and the Village's policy manual. This could also include the Board's rules if adopted in the code of conduct.

¶ 48    On cross-examination, Commander Yancy agreed that it would be improper to discipline or terminate an employee based on a single arrest but noted that the details of the arrest would also play a role in the evaluation. He did not speak with either Nolan or her children, as they were minors. However, he later testified that he had spoken to Nolan, but she would not discuss the incident and was uncooperative. He did not visit McDonald at his home to inspect the apartment but had seen photographs taken by Hanover Park. He did not recall reviewing any evidence that showed that the apartment had been in disarray.

¶ 49    On redirect examination, Commander Yancy testified that all officers were provided a copy of the department rules upon hire as part of the department's field training officer program. Conduct, behavior, and obedience to law policies were also taught in the police academy.

¶ 50    Upon Board questioning, Commander Yancy testified that McDonald's voice had been identified on the second 911 call. On redirect examination by Village counsel, Commander Yancy testified that no statements were included in his investigation as none existed.

¶ 51                                   ii. Chief Willis

¶ 52    Chief Willis testified that he had been employed by the Village for 21 years, starting as a patrol officer. His duties included serving as a fiduciary for the Village and police department, providing education and training for officers, and managing the department. Chief Willis had known McDonald, who was currently under his command, since 2013 or 2014.

¶ 53    On October 5, 2021, Chief Willis was appointed to his current position, which was the same day of McDonald's arrest. He was informed by Commander Yancy that McDonald had been arrested for domestic violence, and he received a call from Hanover Park's chief of police regarding the incident. Although he did not view McDonald as a "bad person," as fiduciary of the department, Chief Willis had to think about what could be done. As such, he instructed Commander Yancy to conduct an internal investigation. After reviewing Commander Yancy's report, Chief Willis decided that termination was appropriate.

¶ 54    Regarding charge one, Chief Willis testified that, beginning at the academy, officers were taught that they would not be looked at in the same light as a civilian and that their behavior would be "magnified ten times." Regarding charge two, he testified that it had been an "embarrassment" to instruct one of his command officers to go to another department and investigate the arrest of one of his own officers. He believed that McDonald had exercised poor judgment, which discredited the Village, the profession, the department, and himself. Regarding the charges of violation of laws, Chief Willis testified that all employees were either taught in the academy or when hired by the Village to abide by the laws of the United States, Illinois, Maywood, and department rules. He viewed the rules as "common sense" and did not believe McDonald exercised good judgment or common sense in this instance.

¶ 55    Regarding charge four, concerning McDonald's probationary status, Chief Willis testified, over McDonald's counsel's objection, that the 2020 disciplinary settlement agreement had predated his tenure as chief but that he was familiar with its circumstances. McDonald had been arrested for  driving under the influence (DUI) in May 2020. The agreement had been a plea imposed by the prior chief, which allowed McDonald to keep his job, provided he did not further violate any rules or commit conduct that would involve reproach, embarrassment, or further discipline. Chief Willis reviewed the agreement and the Board's rules when finalizing charges in the current case. His position was that McDonald's arrest violated that agreement.

¶ 56    On cross-examination by McDonald's counsel, Chief Willis testified that he would not fire an officer based on a single arrest.

¶ 57                                    iii. Officer McDonald

¶ 58    Over McDonald's counsel's objection, McDonald was called on direct examination by the Village as an adverse witness. He had been an officer for nine years, had moved to Maywood, and had trained in their field training program. He confirmed receiving the department rules and admitted they applied to him. McDonald understood that he was to behave and conduct himself in a manner beyond reproach and to prevent embarrassment to the department and agreed that getting arrested "was not a good thing" for the department or Village. McDonald agreed that the rules cited against him in the current charges were not unreasonable.

¶ 59    McDonald confirmed that he had executed his 2020 settlement agreement but stated that he had not understood it at the time it was signed. He agreed that he had been suspended and received discipline in accordance with the agreement but had not agreed to be placed on probationary status, as he believed it had only been meant to resolve the pending DUI investigation against him. Over his counsel's objection, he testified that he had not been given the opportunity

to discuss the agreement with his union representative or attorney, nor did he discuss it with them after it was executed.

¶ 60    McDonald acknowledged that he had been arrested on October 5, 2021, following the placement of a 911 call. He did not deny drinking that night or having a beer in his hands while talking to one of the officers. As a police officer, he knew that, from time to time, victims of domestic violence would change their mind as to whether they wanted to pursue a complaint against their abuser. He was aware that charges could be brought if any unwanted physical conduct occurred and that sometimes victims did not always have visible injuries. After being shown a copy of his criminal case's dismissal order, he understood that the charges had been dismissed based on the lack of a complaining witness, as Nolan had failed to appear in court.

¶ 61    On cross-examination by his counsel, McDonald agreed that "arrests aren't good for anyone." He denied hitting Nolan, aggressively touching her in any manner, causing a scratch mark to her neck, or physically restraining her from calling 911. He reported his arrest to his department as soon as he was able.

¶ 62    Upon Board questioning, McDonald testified that a "loud argument" had precipitated his arrest. Nolan had been upset with him because he had gone to a bar earlier that night and had engaged in crude jokes about her when he returned home. Nolan had wanted him to leave the residence, and he refused to do so because he had just paid rent. He admitted to being intoxicated and otherwise "loud and unpleasant," but denied any physical struggle, hostility, or violence. McDonald denied being in the room when the first 911 call was placed. He was aware that both of Nolan's children had been home but had not seen them until police arrived. He believed Nolan's son had placed the first 911 call and that Nolan had left the room at some point to make a second

call. McDonald further denied knowing at the time that he was being accused of violence but had been aware that Nolan had told officers that she wanted to file charges against him.

¶ 63     McDonald testified that, regarding the 2020 settlement agreement, he had asked to consult with his union representative before he agreed to any discipline and had been verbally told that he would be terminated if he did not sign that day. He signed the agreement "under duress," as he knew he would be facing suspension regardless. He reiterated that he did not understand what "probationary status" meant, as he understood a probationary period to only be applicable to new hires. He did not understand that he could be terminated if he violated any other rules and regulations. He knew that he had to seek treatment for alcohol problems based on this agreement.

¶ 64     On recross examination by Village counsel, McDonald admitted that he had read the title of the 2020 settlement agreement. He did not own the residence in Hanover Park but lived in it at the time of arrest and still lived there with Nolan.

¶ 65                                              e. Standard of Proof Ruling

¶ 66     At the conclusion of McDonald's testimony, counsel for McDonald moved for a ruling on his motion to establish the burden of proof. Following the Board's deliberation on the motion, the following exchange occurred:

> "[HEARING OFFICER]: It's the [Board's] position that in Charge Number 2, violation of laws, that the clear and convincing standard should be the standard by which the Village's burden of proof is judged.
>
> The [Board] having considered the evidence as presented in the Village's case determines that, in fact, a clear and convincing standard has been met regarding the Charge Number 2, violation of laws, section 1.2, obedience to laws."
>
> [MCDONALD'S COUNSEL]: "I'm sorry, what was that finding?"

[HEARING OFFICER]: "They found that, number one, clear and convincing applies, and number two, that that standard has been met, that the Village sustained its burden to clear and convincing evidence based on *** the testimony and evidence that the [Board] heard."

[MCDONALD'S COUNSEL]: "I didn't put on a case yet."

[HEARING OFFICER]: "Well, you asked for us to make the decision."

[MCDONALD'S COUNSEL]: I just asked as to which standard applied[.]"

[HEARING OFFICER]: "Well, they determined that the clear—they didn't determine that it's been proven."

[MCDONALD'S COUNSEL]: "Oh."

[HEARING OFFICER]: "They determined that the clear and convincing standard applies and that—and that sufficient evidence has been given to proceed with that standard, not that they've determined that it occurred."

[MCDONALD'S COUNSEL]: "They haven't found guilt?"

[HEARING OFFICER]: "No, not at all."

[MCDONALD'S COUNSEL]: "Thank you for making that clear."

[HEARING OFFICER]: "Clear and convincing standard applies, okay. Excuse me if I said that wrong."

[MCDONALD'S COUNSEL]: "That's what it sounded like to me."

[VILLAGE COUNSEL]: "So just by point of clarification, you said Charge Number 2—"

[BOARD'S ATTORNEY]: "Charge Number 2—"

[VILLAGE COUNSEL]: "Is there a different standard being applied to a different charge?"

[HEARING OFFICER]: "Yes, preponderance of the evidence for the balance of the complaint—"

[VILLAGE COUNSEL]: "Okay. Thank you."

[HEARING OFFICER]: "Because they don't allege any violations of law.

The clear and convincing standard only applies to those allegations where violations of law are alleged. The [Board] finds that that is appropriate to apply that to Charge Number 2 and will make their decision based on that standard."

¶ 67   McDonald did not call any rebuttal witnesses following this exchange.

¶ 68                               f. Finding of Guilt Ruling

¶ 69   Following closing arguments that same day, the Board deliberated and voted unanimously that Chief Willis had proven, by a preponderance of the evidence, that McDonald had violated section 2.3 of the rules of the department, and the terms of his disciplinary settlement (charges one, three, and four). The Board further found that Chief Willis had proven, by clear and convincing evidence, that McDonald had violated Section 1.2 of the department rules for violations of law (Charge 2).

¶ 70                            g. Penalty Phase—Hearing Day 5

¶ 71                               i. Stipulated testimony

¶ 72   The parties stipulated to the testimony of several members of the Maywood police department, specifically from "several officers, a sergeant, and a lieutenant" who, if called, would testify on McDonald's behalf that he was, *inter alia*, trustworthy, exercised good judgment in life

and death situations, and apprehension or arrests of suspects, was a hard worker, was kind to members of the public, and was overall a good officer and helpful teammate.

¶ 73                                ii. Commander Yancy

¶ 74    On direct examination by Village counsel, Commander Yancy testified that he had reviewed McDonald's disciplinary history, which included his personnel file and various investigation reports. Over McDonald's counsel's objection, the first two pages of Commander Yancy's investigation report to Chief Willis, which detailed McDonald's disciplinary history, were admitted.

¶ 75    In 2014, McDonald had been arrested, placed on administrative leave, and terminated by the Board. However, he was reinstated in December 2014. Commander Yancy had not been personally involved in investigating that incident and did not know why he had been reinstated.

¶ 76    In 2017, McDonald was disciplined for a violation of department policy and received a three-day suspension. McDonald had been on light duty, and Commander Yancy had advised him to wear a uniform at work, which included a shirt, tie, slacks, and shoes as was required for all officers. He arrived at work the next day out of uniform and was cited for insubordination. Commander Yancy found this incident to be significant, as McDonald had been "given a specific direction" that affected his presentation as a member of the department to the public.

¶ 77    In 2019, McDonald received a combination disciplinary citation for conduct and behavior violations, which resulted in one overall suspension for four days with two days in abeyance and a 12-month probationary period. Commander Yancy had not been personally involved in that discipline but had reviewed the investigative reports. One incident had involved McDonald giving away an inventoried bicycle stored as Village property without prior permission to do so. The

second incident involved insubordination, where McDonald had gone on patrol duty without informing the oncoming supervisor that he was assigned to desk duty.

¶ 78    Later in 2019, McDonald was suspended for 10 days for a conduct and behavior violation, which also included a 30-day suspension in abeyance and a performance plan placing him on a years' probation. Commander Yancy had been notified by an assistant state's attorney that McDonald had failed to attend court on two different occasions after being issued subpoenas to appear. Commander Yancy had been advised to attend court and speak with the judge and was further directed to ensure that McDonald appeared at the next court date. Officers who received subpoenas were expected to be present in court and could be held in contempt and arrested thereafter. Further, missing court would affect the administration of justice for that specific case. An officer could also face disciplinary action for missing court.

¶ 79    In 2020, McDonald executed his disciplinary settlement agreement. The underlying violation was that McDonald had pled guilty to a DUI charge, resulting in $1,500 in court costs, fees, and supervision. Commander Yancy also believed that McDonald had to participate in counseling, treatment, and a "victim panel," as such activities were usually required for those types of sentences. Commander Yancy had been involved in issuing this discipline after the prior chief asked for his recommendation. He had recommended that McDonald receive a 20-day suspension and probation for 12 months, which would give McDonald "an opportunity to better himself." He had considered recommending termination but did not do so because he "want[ed] to see people do better" and hoped that this incident would "open [McDonald's] eyes and make him a better person, not just as a police officer, but a better person for himself and his family." McDonald received the recommended 20-day suspension.

¶ 80    On cross-examination by McDonald's counsel, Commander Yancy testified that he did not believe McDonald's 2014 discipline related to his 2014 domestic violence arrest had been "set aside," but knew that McDonald had been reinstated. He was shown a copy of a letter dated November 12, 2014, which had been apparently signed by Nolan and notarized. He confirmed reviewing the letter during his current investigation, which stated that Nolan had fabricated her previous accusations of domestic violence and was further recanting her allegations. When asked if "the only reason [they were] here [was] based upon his arrest by Hanover [Police]," Commander Yancy responded, "That's what [McDonald is] charged with, yes."

¶ 81    On redirect examination by Village counsel, Commander Yancy reiterated that the prior discipline—involving the bike, leaving his post, and failure to appear in court—were all violations of department rules. Upon Board questioning, he clarified that the bike had been stored in the department's garage, which held missing items brought in by citizens or which had been present at a crime scene. He was unsure if McDonald had completed an EAP for his DUI charge.

¶ 82                                iii. Chief Willis

¶ 83    On direct examination by Village counsel, Chief Willis testified that, although he believed McDonald to be a good person and officer, he had a responsibility to safeguard the department and the Village as chief of police. He had to make sound decisions and expected his officers to do the same. After learning of McDonald's most recent arrest, combined with his prior disciplinary history, he determined that termination was necessary for the betterment of the department and Village, as he did not see McDonald "doing anything for the department that[ ] [would] *** move [them] into the next millennium."

¶ 84    On cross-examination by McDonald's counsel, Chief Willis testified that it was his understanding that the 2014 domestic violence incident had been McDonald's first arrest as a

police officer and that he had not been disciplined after reinstatement. He had also reviewed Nolan's retraction letter but did not know her and could not judge her credibility. He still recommended termination based on a lack of "sound decision," where he believed McDonald had "put himself in that place."

¶ 85 Chief Willis acknowledged that the Village and department had adopted the concept of progressive discipline, where infractions would first be addressed with verbal warnings or reprimand and then escalated up to termination. When asked if McDonald's prior discipline had "seemed to work," Chief Willis responded that this was "subjective" and that if one was still getting suspended for not making sound decisions, one had to ask "if the suspension is working."

¶ 86 On redirect examination by Village counsel, Chief Willis testified that he determined what discipline was appropriate, based on a review on the specific offense, the facts of the investigation, and prior history. He did not recommend termination based on one incident but did recommend termination when the officer failed to make "sound decisions" "over a period of time." In McDonald's case, there were several violations over several instances. Chief Willis believed McDonald's continued employment would be a detriment to the department, as police officers were constantly in the "limelight," the department worked for the public, and an officer's behavior in the public eye "[wrote] the narrative" for the department and Village as a whole. Any "negative light" or "negative narrative" would result in the public's loss of trust; thus, officers had to "walk the straight and narrow as best" as they could.

¶ 87 On recross examination, Chief Willis testified that McDonald's conduct affected the efficiency and operations of the department, given that the current hearing was occurring, and that if McDonald had "made a sound decision on the day in question," he would still be working. Moreover, even if no charges had been brought, the department's efficiency would have still been

impacted, as this was not McDonald's first suspension and his shifts ultimately would have to be covered by other officers. He agreed that an arrest did not necessarily result in discipline, but the arrest still brought "negativity" and "embarrassment" to the Village. He reiterated that McDonald's termination was based on "a lot of things," with his arrest being "part of the reason."

¶ 88    Upon Board questioning, Chief Willis testified that, if an officer was required to be in court but could not appear, officers could notify the department in a variety of ways, either directly to the court officer who maintained a weekly court schedule, or by contacting the state's attorney. When asked why McDonald's 2014 domestic violence case had been dismissed, Chief Willis responded that the state's attorney determined that there was insufficient evidence to prosecute him.

¶ 89                                   iv. McDonald

¶ 90    Over his counsel's objection, McDonald was called as an adverse witness by Village counsel. [6] In July 2017, he had been suspended by the previous chief while on light duty for an injury. He had been advised to be in business casual attire with a tie, while manning a desk and received a three-day suspension after failing to wear one. McDonald was shown a copy of a negotiated disciplinary settlement agreement, dated December 2018, and disagreed that the agreement accurately reported what happened. He had objected to having unrelated incidents being combined into one disciplinary procedure. He admitted to surrendering a bike to a citizen without seeking permission. McDonald further admitted that his discipline as related to the subpoena, the bike, not being in proper attire, and leaving his post had resulted from his violation of various department rules.

---

[6]For purposes of efficiency, we have combined into one section McDonald's penalty phase testimony given upon examination as an adverse witness and on direct examination.

¶ 91    On cross-examination by his counsel, McDonald provided clarification as to the bike incident. The bike had been "discarded" but not yet inventoried, as it did not have a "Maywood label" on it. He gave the bike to a citizen who was missing one. He admitted that this was not an exercise of his best judgment and that he should have contacted his supervisor first. He had been advised by the previous chief that if he did not accept the 10-day suspension, he would be disciplined more severely if he chose to go to hearing. Regarding the discipline for inappropriate attire, McDonald testified that the previous chief had ordered him to sign the combined disciplinary agreement and then to "grieve it." Regarding the missed court dates, McDonald testified that he had missed the first court date after his daughter had been home sick from school and he had elected to stay with her. He had missed the second court date when he fell ill from an ongoing illness, which had caused him to take extended medical leave that year. He admitted that he "could have handled those situations better" with communication with the state's attorney's office.

¶ 92    Upon Board questioning, McDonald clarified that the citizen who had accepted the bike had been arrested after being heavily intoxicated. McDonald knew the offender to generally travel by bike. A bike had been on the scene where the citizen had been arrested, but McDonald erred on the side of caution and left it behind. Once the citizen was released from custody, McDonald gave him a bike that had been in the department's garage with no evidence tag on it. Regarding the inappropriate attire incident, McDonald testified that he had consulted with a union representative, who indicated that "business casual was fine" and that he did not have to wear a tie as there was no uniform policy for desk duty. He admitted that the previous chief had asked him to wear a tie. Regarding leaving his desk, McDonald testified that he had been on desk duty after he cut his hand during an arrest. Although he had been cleared to return to patrol by the Village doctor, he had

been told to err on the side of caution and remain on desk duty. Days after being cleared, he asked to return to patrol, and two immediate supervisors approved the request.

¶ 93    On direct examination by his counsel as a rebuttal witness, McDonald testified that he had received various awards, as well as positive performance evaluations and comments from the community. He had not been disciplined for the 2014 domestic violence arrest. Since his current arrest, he had been in contact with Nolan, and she had "apologized" to him. McDonald again denied being physically aggressive with Nolan or preventing her from calling 911.

¶ 94    McDonald admitted to having a problem with alcohol and had been diagnosed with pancreatis. He was currently in treatment and counseling with Alcoholics Anonymous, had taken classes in relation to the DUI, and currently consulted with his minister who was also a retired police chief. McDonald had also moved away from home, where he had easy access to a bar, and currently lived with his father in an environment where drinking was not tolerated. He was currently three weeks' sober. When asked if he would "embarrass" the Board if reinstated, McDonald responded that all his disciplinary incidents had been related to his alcohol use and that he had taken "drastic steps" in his treatment to end those problems.

¶ 95    Upon Board questioning, McDonald testified that he had not considered asking Nolan to come speak on his behalf, as she had been "scared" and "intimidated" following Commander Yancy's attempts to speak with her. On redirect examination by his counsel, McDonald testified that he was attempting to be admitted for inpatient treatment at St. Michael's House, an organization that assisted first responders in recovery, and had been placed on the waiting list.

¶ 96                                    h. Board's Termination Ruling

¶ 97    Following deliberations, the Board ruled that there was "cause" to terminate McDonald, effective immediately.

¶ 98    On June 17, 2022,[7] the Board served its written Final Order and Decision. Preliminarily, the order stated that no questions had been raised regarding the Board's jurisdiction to hear the charges against McDonald. The order further noted that it had been Chief Willis's burden to prove the allegations "by a preponderance of the evidence," but that the burden of proof as to charge two was by clear and convincing evidence.

¶ 99    Substantively, the order stated that Chief Willis had sustained his burden on charges one, two, and three, based on each respective burden, and that there was "cause" to terminate McDonald based on its previous findings for "conduct unbecoming an officer, violations of law and past disciplinary history." The order noted that the Board had not considered any evidence concerning the 2014 domestic violence arrest and struck it from McDonald's record.

¶ 100                    C. Complaint for Administrative Review

¶ 101   On July 15, 2022, McDonald, through his union, filed a complaint for administrative review in the circuit court against the Board, the Village, and Chief Willis. The complaint sought judicial review of his termination, and alleged, *inter alia*, that the Board lacked jurisdiction and legal authority to consider the matter, and that its decision was against the manifest weight of the evidence, was arbitrary and capricious, and was legally erroneous. McDonald further sought reinstatement and full backpay and benefits. The Board filed the administrative record as its answer to the complaint.

¶ 102   On August 11, 2023, following briefing and oral arguments, the circuit court affirmed the decision to terminate, and this appeal followed.

---

[7]Although the written order indicates that it was signed on March 22, 2022, the order's certificate of service shows that it was not served upon McDonald until June 17, 2022. The Board's written order also incorrectly states on page one that the Kankakee Board of Fire and Police Commissioners had presided over the matter.

¶ 103                              II. ANALYSIS

¶ 104                              A. Jurisdiction

¶ 105    Absent certain exceptions, a final administrative decision must be challenged within 35 days of service to the party affected by the decision. See 735 ILCS 5/3-103 (West 2020). The Board's final order, signed on March 22, 2022, was served on McDonald on June 17, 2022. McDonald timely filed his complaint for administrative review on July 15, 2022. McDonald's notice of appeal was also timely filed on September 8, 2023.[8]

¶ 106                              B. Standard of Review

¶ 107    Review of an administrative agency's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)). On appeal, we review the decision of the agency rather than that of the circuit court (*Buchanan v. Cook County Sheriff's Merit Board*, 2023 IL App (1st) 220320, ¶ 56), and all questions of fact and law are strictly limited to the administrative record (*Scatchell v. Board of Fire & Police Commissioners for Melrose Park*, 2022 IL App (1st) 201361, ¶ 35). Our standard of review is dependent on the nature of the question presented. *Buchanan*, 2023 IL App (1st) 220320, ¶ 56. Questions of law are reviewed *de novo*. *Id.* We defer to an agency's factual decisions unless they are against the manifest weight of the evidence. *Id.* Finally, we review questions of law and fact under a clearly erroneous standard. *Id.*

¶ 108    An agency's factual findings are deemed *prima facie* true and correct. 735 ILCS 5/3-110 (West 2020). "It is within the Board's province to assign the appropriate weight to the evidence, resolve conflicts presented by it, and determine the credibility of the witnesses." *Scatchell*, 2022 IL App (1st) 201361, ¶ 36. As such, a reviewing court may not reweigh the evidence, make an

---

[8]A copy of McDonald's notice of appeal is filed stamped September 8, 2023. The notice was filed by the clerk of our court on September 12, 2023.

independent determination of the facts, or substitute its judgment for that of the agency. *McCleary v. Board of Fire & Police Commissioners of Woodstock*, 251 Ill. App. 3d 988, 992 (1993). However, our deference to the Board is not limitless, in that there must be competent evidence in the record to support the decision. *Scatchell*, 2022 IL App (1st) 201361, ¶ 37. Thus, where the record contains evidence that supports the Board's factual conclusions, we may not upset those findings, even if an opposite conclusion is also reasonable. *Id.*

¶ 109   Finally, when reviewing an administrative agency's decision to discharge an employee, our review is two-fold. *Buchanan*, 2023 IL App (1st) 220320, ¶ 57. First, we evaluate whether the agency's factual findings are contrary to the manifest weight of the evidence. *Id.* Second, we determine whether those findings provide a sufficient basis for the conclusion that there was cause for discharge. *Id.* It is not within our purview to determine if we would have given a more lenient sanction; instead, our review is limited to whether the Board acted unreasonably or arbitrarily by imposing discipline that was otherwise inappropriate or unrelated to the needs of service. *Scatchell*, 2022 IL App (1st) 201361, ¶ 40.

¶ 110                                    C. Arguments

¶ 111                                 1. Preliminary Matters

¶ 112   Prior to proceeding, we address a recurring flaw apparent in the briefing here on appeal. Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires parties to include a statement of facts in their brief that states such facts "accurately and fairly without argument or comment." McDonald's counsel's brief presents argumentative factual recitations in violation of the court's rules, which are mandatory. *Conservatorship Estate of Black v. Black*, 2019 IL App (1st) 181452, ¶ 11. We remind counsel that failure to comply with the rules runs the risk of a reviewing court

striking offending portions of a noncompliant brief, or, in rare cases, dismissal of an appeal for serious rule violations. *Id.*

¶ 113  Next, a significant portion of the briefing concerns the admission of a 911 call and in-car audio and video recordings. Such recordings were played before the Board, and the appellate court record contains a picture of an electronic copy of what we presume to be such items. However, no such copy appears to have been filed with our court, which is evidenced by the parties' citation to the Board's hearing transcript, rather than to the recordings themselves. As appellant, it was McDonald's burden to provide this court with a complete and adequate record for review. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Thus, without the benefit of the recordings, we must presume that their admission was in conformity with the law, with any doubts that may arise from the record's incompleteness to be resolved against McDonald. *Scatchell*, 2022 IL App (1st) 201361, ¶ 129.

¶ 114                    2. Whether the Board Had Jurisdiction Over the Proceedings

¶ 115  McDonald contends, as he did below, that the Board was divested of jurisdiction when the Village's witness list was not timely filed pursuant to the CBA and, additionally, when he was called as an adverse witness. He maintains that the CBA supersedes any Board rules, the Municipal Code (65 ILCS 5/1-1-1 *et seq.* (West 2020)), and section 15 of the Illinois Public Labor Relations Act (Labor Relations Act) (5 ILCS 315/15 (West 2010)).the Board of Fire and Police Commissioners Act, 5 ILCS 315/15.

¶ 116  The Board responds that any violation of the CBA was an issue to be resolved between the Village and McDonald's union through a grievance filing. The Board further maintains that its jurisdiction is derived from its enabling act and that Illinois law is otherwise clear that the Board's statutory authority cannot be abrogated by a collective bargaining agreement, citing *Scatchell*,

2022 IL App (1st) 201361. Further, the Board observes, the CBA does not contain any language that would divest the Board of jurisdiction if the witness list requirement was not followed or that an unrequired "list" was not provided. Finally, the Board maintains that McDonald suffered no prejudice based on the timeline in these proceedings.

¶ 117 The Village agrees that, although section 7.2 of the CBA provides for the timely filing of a witness list, McDonald suffered no prejudice given the timeline of events in this case, including (1) its disclosure to McDonald's counsel on December 21, 2021, (2) the fact that no witness testified until February 8, 2022, following multiple agreed continuances, and (3) that McDonald's position as respondent did not require such notice.

¶ 118 McDonald's argument, although not expressly articulated as such, is predicated on the Board's denial of his motion to dismiss the charges against him. Notably, that motion did not argue that the Board lacked jurisdiction based on the alleged failure to disclose witnesses. Regardless, it is well-established that the jurisdiction of a judicial body cannot be waived and may be raised during any portion of the proceedings. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 333-34 (2002). Ultimately, however, McDonald's argument suffers from another defect, as he misperceives the concept of the Board's authority to hold the hearing (*i.e.*, its jurisdiction over the hearing) with the Village's compliance with its collective bargaining obligations.

¶ 119 Subject matter jurisdiction "refers to the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *Id.* at 334. The Illinois Constitution has vested the circuit court with original jurisdiction over all justiciable matters, except in certain circumstances. Ill. Const. 1970, art. VI, § 9. "However, the legislature is empowered to vest original jurisdiction in an administrative agency and may do so where it enacts a comprehensive

- 31 -

statutory scheme creating rights and duties not found in common law or equity." *Barron v. City of Chicago*, 2025 IL App (1st) 240066, ¶ 26.

¶ 120   Pursuant to section 10-2.1-17 of the Municipal Code (65 ILCS 5/10-2.1-17 (West 2020)), the Board is empowered to preside over disciplinary actions for removal or discharge. Hearings regarding disciplinary matters are to be provided as set forth in statute, unless the employer and union representing the individual "have negotiated an alternative or supplemental form of due process" as a term of a collective bargaining agreement and "[s]uch bargaining shall be mandatory unless the parties mutually agree otherwise." *Id.* The statute further provides that the Board "shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time." *Id.* The Board is also authorized to create its own rules for hearings and removal (*id.* § 10-2.1-5), and the Village has enacted rules and regulations to assist in carrying out such duties (see Maywood Village Code § 31.21(E) (adopted Aug. 6, 2024); see also Maywood Village Code § 31.21 (adopted July 14, 1988).

¶ 121   Based on our reading of statute, the only express language that would divest the Board of jurisdiction would be a failure to commence a hearing within 30 days of charges being filed, absent certain circumstances. See *Bridges v. Board of Fire & Police Commissioners of Zion*, 83 Ill. App. 3d 190, 193-95 (1980) (board lost jurisdiction of case after failing to commence a hearing within 30 days of a remand); *Riggins v. Board of Fire & Police Commissioners of City of Peoria*, 107 Ill. App. 3d 126, 129-30 (1982) (where delay is not attributable to board, but to another party, statute's 30-day requirement is not violated).

¶ 122   The Final Order and Decision indicates that the Board filed the charges against McDonald on November 1, 2021, and McDonald does not dispute that fact. Hearing on the charges was set to commence on November 29, 2021. On that date, both parties agreed to waive any applicable

30-day requirement for commencement of the hearing, given that neither was prepared to move forward. Additionally, further continuances were granted based on the parties' preference to not begin testimony until resolution of McDonald's criminal charges.

¶ 123   McDonald nevertheless contends that the CBA requires more than just the filing of charges and an opportunity to present one's defense, so much so that failure to adhere to them would somehow strip the Board of jurisdiction to hear the charges. Citing a provision of the Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2010)), McDonald argues that these expanded CBA requirements take precedence over any other statute or rule.

¶ 124   We acknowledge that section 15(b) of the Labor Relations Act provides that "any collective bargaining contract between a public employer and a labor organization executed pursuant to this Act" would "supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents." *Id.* § 15(b).[9] However, we agree with the Board and Village and find nothing in the CBA to imply that the Board would lose jurisdiction if the Village did not timely file their witness list. Moreover, this court has held that the Board's authority, which is derived from statute, cannot be abrogated by a collective bargaining agreement, as the CBA "could not trump the Board's ability to investigate and adjudicate potential misconduct." *Scatchell*, 2022 IL App (1st) 201361, ¶ 103; see *Parisi v. Jenkins*, 236 Ill. App. 3d 42, 52 (1992).

¶ 125   Further, we agree with the Village and the Board that McDonald suffered no prejudice in not receiving a full witness list within the time frame provided in the CBA. Section 7.2 of the CBA

---

[9]We note that the 2010 version of this statute is cited because the 2014 amendment to this section, along with the entirety of Public Act 98-599 (eff. June 1, 2014) (which reformed the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2012))), was held unconstitutional in *In re Pension Reform Litigation*, 2015 IL 118585. The relevant portion of the 2010 version cited here has been unchanged by that amendment.

requires disclosure of the witness list by not later than 10 working days prior to the start of the relevant hearing. Without question, the witness list was not provided to McDonald 10 days prior to the set November 29, 2021, hearing date. In fact, the list was not provided until some weeks later, but well in advance of any witness testimony. The record reflects various agreed upon continuances based on McDonald's pending criminal complaint in Du Page County. Further, in each preliminary hearing, the record reflects discussion of the presentation of certain witnesses, including McDonald, who had been ill during the earlier half of the proceedings. Finally, both parties agreed that a witness list had been distributed to McDonald's counsel by at least December 21, 2021. Therefore, because witness testimony did not begin until February 8, 2022, long after charges had been filed, and as McDonald was able to cross-examine each witness, it would be disingenuous to say that McDonald could be surprised by any witness testimony given the two-month time gap. See 65 ILCS 5/10-2.1-17 (West 2020).

¶ 126    As to McDonald himself, we agree with the positions taken by both the Village and the Board that because McDonald was a party to the proceeding, he did not have to be given notice to be called as a witness. Notably, both parties assert this proposition without any cited authority. We note that, although administrative proceedings, like judicial proceedings, are "governed by fundamental principles and requirements of due process of the law," administrative proceedings do not require the strict procedures of its counterpart to satisfy due process. *Scatchell*, 2022 IL App (1st) 201361, ¶ 116. "Instead, administrative hearings may incorporate a form of procedure that is suitable and proper to the nature of the determination to be made and that conforms to the fundamental principles of justice." *Id.* The administrative body has broad deference in conducting its hearing and only abuses its discretion to do so when it acts arbitrarily or capriciously. *Id.* ¶ 117. We do not find that the Board acted so here. The record reflects that a "Notice and Admonition,"

signed by Chief Willis on February 4, 2022, was e-mailed to McDonald on February 9, 2022. McDonald subsequently testified on February 15, 2022, during the liability phase of the hearing, and again on March 22, 2022, during the penalty phase. Moreover, we reiterate that the charges against McDonald had been filed months prior.

¶ 127   Accordingly, we find McDonald's argument concerning jurisdiction to be meritless and find no due process violations regarding witness disclosures.

¶ 128                              3. Whether the Hearing Was Impartial

¶ 129   McDonald next contends that the Board exhibited unfair bias against him, based on the single exchange between his counsel and the hearing officer during the ruling on his motion to establish a burden of proof. At the outset, the Village responds that McDonald's argument violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), as it is unsupported by authority. The Village further argues that the record reflects a fairly conducted hearing, in that McDonald had been heard throughout the proceedings and utilized his right to cross-examination. Further, the Village maintains that it was clear that the hearing officer was confused about the Board's ruling but subsequently clarified his mistake thereafter. The Board also defends its hearing officer and the impartiality of the hearing and asserts that, as a trier of fact, it was required to assess whether sufficient evidence had been presented by Chief Willis before letting McDonald put on his case, akin to a directed verdict.

¶ 130   At minimum, a "fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992). Further, we assume that an administrative hearing is not a partisan one without any showing to the contrary. *Id.* at 94-95. The record reflects that McDonald was provided with written

charges and an opportunity to be heard in his own defense. See 65 ILCS 5/10-2.1-17 (West 2020). Thus, this issue turns on the hearing officer's somewhat confusing announcement of the Board's ruling on McDonald's motion to establish a burden of proof.

¶ 131 Preliminarily, we address the Village's contention that McDonald's argument violates 341(h)(7) for failure to cite relevant authority in support of his contention. A review of McDonald's brief confirms that, but for a general case citation requiring that hearings be impartial, McDonald provided no other authority, as required by our supreme court rules. Thus, this contention is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (appellant's contentions must be supported by citation of supporting authorities); *International Union of Operating Engineers Local 965 v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 140352, ¶ 20 (a party forfeits review of issue on appeal by failing to support its argument with citation to authorities).

¶ 132 Forfeiture aside, we find McDonald's contention to be meritless. Having earlier set forth verbatim the exchange between McDonald's counsel and the hearing officer, we need not repeat it here. The record fairly reflects that the hearing officer misspoke, corrected himself, and then clarified the pertinent burden of proof for all charges without issuing any evidentiary dispositive ruling as to the charges. Thus, we do not find any evidence of partiality in this single instance to have otherwise improperly affected the proceedings.

¶ 133                    4. Disputed Burdens of Proof

¶ 134             a. "Clear and Convincing" Versus "Preponderance of the Evidence"

¶ 135 Next, McDonald contends that the Board erred in failing to apply the clear and convincing standard to all the charges against him, as this was a civil proceeding where the underlying conduct is criminal in nature, citing *Wilkey v. Illinois Racing Board*, 65 Ill. App. 3d 534 (1978), and *Shallow v. Police Board of Chicago*, 95 Ill. App. 3d 901 (1981), as dispositive.

¶ 136    The Village responds that the preponderance of the evidence standard was proper as to the noncriminal charges as they were premised on McDonald's unprofessional conduct as an officer and within the department, citing *Launius v. Board of Fire & Police Commissioners of Des Plaines*, 151 Ill. 2d 419 (1992), in support. The Village further argues that *Wilkey* and *Shallow* are distinguishable where the administrative agency in those cases effectively adjudicated the alleged criminal misconduct, whereas here there was no dispute that McDonald's domestic violence charges had been dismissed and the other remaining administrative charges concerned McDonald's conduct during the arrest and his prior disciplinary infractions.

¶ 137    The Board agrees that the noncriminal conduct charges were properly assessed based on a preponderance of the evidence as they were not dependent on whether an arrest or criminal charge had been filed. However, the Board reasons, even assuming that the wrong standard had been applied, the facts used to establish charge two were also used to sustain the remaining charges. The Board also agrees that McDonald's citations to *Wilkey* and *Shallow* are misplaced. The Board further points out McDonald's failure to cite our supreme court's case in *Board of Education of Chicago v. State Board of Education*, 113 Ill. 2d 173 (1986), a seminal case for determining what burden should apply in administrative agency cases. In examining that case, the Board further observes that, per *Board of Education*, it applied a "more stringent burden of proof" as to charge two than was required and therefore committed no error.

¶ 138    Notably, both *Wilkey* and *Shallow* were decided prior to our supreme court's decision in *Board of Education*, and in any case, we would find neither persuasive. In *Shallow*, the burden of proof was not at issue, as the parties in that case *agreed* that the standard was clear and convincing. See *Shallow*, 95 Ill. App. 3d at 908. As to *Wilkey*, that case concerned a racing board decision

revoking a veterinarian's license, a completely different agency, and thus not binding on a police board's determination as to termination proceedings. See *Wilkey*, 65 Ill. App. 3d at 536.

¶ 139   In *Board of Education*, our supreme court addressed a confusing area of law regarding burdens of proof in administrative proceedings. Prior to 1939, Illinois courts had adhered to the rule where, in civil cases where criminal conduct was alleged, such conduct had to be proved beyond a reasonable doubt. *Board of Education*, 113 Ill. 2d at 187. Ultimately, the court in *Board of Education* determined that, in the context of tenured teacher dismissal proceedings where criminal conduct was charged, the preponderance of the evidence standard applied. *Id.* at 189. The court advised, however, that its outcome was not necessarily applicable in all administrative agency proceedings. *Id.* Rather, that determination would be resolved by certain considerations for each proceeding that balanced " 'the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure.' " *Id.* at 190-91 (quoting *Santosky v. Kramer*, 455 U.S. 745, 754 (1982)).

¶ 140   We note, as did the court in *Clark v. Board of Fire & Police Commissioners of Bradley*, 245 Ill. App. 3d 385, 391 (1993) (observing that, although some courts had applied the preponderance of the evidence standard for police dismissal cases, *Board of Education* contained "self-limiting language" and its test should still be applied in determining the proper standard of proof for police officer dismissal cases involving allegations of criminal conduct), that, by its own language, *Board of Education* was limited to tenured-teacher dismissal proceedings. *Clark*, 245 Ill. App. 3d 385, 391 (1993) (observing that, although some courts had applied the preponderance of the evidence standard for police dismissal cases, *Board of Education* contained "self-limiting language" and its test should still be applied in determining the proper standard of proof for police

officer dismissal cases involving allegations of criminal conduct). Following the court's guidance in *Board of Education*, the court in *Clark*, after applying the requisite test, determined that when an administrative complaint alleges Illinois law violations, the agency should use a preponderance of the evidence standard. *Id.* at 392; see *Teil v. City of Chicago*, 284 Ill. App. 3d 167, 170 (1996) (distinguishing *Shallow* as unpersuasive and applying preponderance of the evidence standard where alleged misconduct involved a crime). But see *McCleary*, 251 Ill. App. 3d at 1001 (noting generally that, where criminal conduct is alleged in civil proceedings, the burden of proof is clear and convincing). We follow *Clark* and find a preponderance of the evidence standard sufficient to protect a police officer's position, even when criminal conduct is alleged. See *Clark*, 245 Ill. App. 3d at 390-92. Further, given that the Board applied the higher clear and convincing evidence standard to the violation of laws charge (Charge 2), we find any error in the Board's burden of proof determination in this case was harmless.

¶ 141                    b. "Cause" Versus "Just Cause"

¶ 142   Next, in a one-paragraph argument, McDonald contends that the Board erred in applying the "cause" standard to its termination proceeding, rather than the "just cause" standard articulated in the CBA. The Village initially responds that McDonald's contention is undeveloped. The Village and Board point out that section 7.3 of the CBA, as applicable here, requires that "cause" be found, especially (1) where it was McDonald's choice to proceed before the Board rather than before an arbitrator and (2) because the CBA incorporates section 10-2.1-17 of the Municipal Code, which provides that the correct standard is "for cause" (see 65 ILCS 5/10-2.1-17 (West 2020)).

¶ 143   We initially acknowledge that, during these proceedings, even amongst the parties and the Board, the terms "cause" and "just cause" were used interchangeably. However, we ultimately

agree with the Village and Board that the "cause" standard was applicable here. Notably, the "just cause" standard advanced by McDonald, found in section 7.7 of the CBA, discusses proceedings before an arbitrator, as opposed to those before a Board. There is no dispute that McDonald elected to proceed before the Board as opposed to arbitration.

¶ 144   Section 7.3 of the CBA, on the other hand, focuses on procedures before the Board and provides:

"No non-probationary Maywood Police Officer shall be removed or discharged *except for cause*, upon written charges, and after opportunity to be heard in his own defense. *** Other matters with regard to due process considerations as to charges filed against a Maywood Police Officer shall be governed by 65 ILCS 5/10-2.1-17 [the Board of Fire and Police Commissioners Law]." (Emphasis added.)[10]

¶ 145   We are mindful that the Board of Fire and Police Commissioners Law contemplates that certain due process procedures outlined in the statute may be affected by a governing collective bargaining agreement. However, McDonald cites to no authority for police disciplinary hearings before the Board that utilized a "just cause" over a "cause" standard. Accordingly, we find no error in the Board's application of the cause standard to its overall termination decision.

¶ 146   5. Whether the Finding of Guilt Was Against the Manifest Weight of the Evidence

¶ 147   Next, McDonald challenges the Board's finding of guilt arguing, first, that the Board's finding was based solely on inadmissible hearsay. He additionally contends that the record is devoid of factual support to affirm a guilty finding, as it was his testimony that he did not engage in any of the actions for which he was accused, citing *Morelli v. Ward*, 315 Ill. App. 3d 492 (2000).

---

[10]Section 10-2.1-17 of the Municipal Code provides that for removal or discharge, a police officer can only be removed or discharged "for cause." 65 ILCS 5/10-2.1-17 (West 2020).

Finally, McDonald argues that the Board failed to properly consider Nolan's prior recantation of domestic violence allegations and its relationship to the current charges and instead credited it over his own unimpeached testimony.

¶ 148   The Village maintains that the recordings were admissible and reiterates that there was sufficient evidence to sustain the finding of guilt, as the charges filed against McDonald were not based solely on Nolan's word but were also based on Officer Paup's observations at the scene and his testimony that he would have filed a criminal complaint even without Nolan's authorization.

¶ 149   The Board reiterates that the Administrative Review Law prohibits reversal of an agency's evidentiary decision unless it is shown that such error or failure materially affected the rights of any party and resulted in substantial injustice. The Board maintains that no such errors were made regarding the applicable recordings and that there was still sufficient evidence to sustain guilt based on the photographs of Nolan and the nature of the Hanover Park investigation. Further, the Board concludes, Nolan's prior recantation was only considered during the penalty phase of the proceeding as mitigation evidence and not for credibility purposes.

¶ 150   "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted." *Id.* at 497. Usually, hearsay evidence in administrative proceedings is prohibited unless it falls within a hearsay exception. *Id.* Even so, an agency's decision to admit such evidence is discretionary and will not be disturbed absent an abuse of discretion. *Id.*

¶ 151   As we noted earlier, McDonald failed to provide this court with copies of the 911 calls and in-car audio and video recordings. Thus, we are unable to determine whether the Board erred in admitting any of those items, and we must presume the ruling was in conformity with the law. See *Foutch*, 99 Ill. 2d at 391-92. Moreover, a finding by this court that the materials were improperly admitted would not necessarily yield McDonald's desired outcome. Indeed, the Administrative

Review Law provides that technical errors in administrative proceedings or the agency's failure to observe technical rules of evidence are insufficient to reverse a decision "unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice." 735 ILCS 5/3-111(b) (West 2020); see *Abrahamson*, 153 Ill. 2d at 94 (noting that although generally hearsay evidence is not admissible in an administrative proceeding, "where there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony *** is not prejudicial error" (internal quotation marks omitted)); *McCleary*, 251 Ill. App. 3d at 993 ("strict rules of evidence that apply in a judicial proceeding do not apply in proceedings before an administrative agency").

¶ 152   Putting aside the hearsay arguments, we are unable to conclude that the Board's finding of guilt was against the manifest weight of the evidence. The relevant charges involved abiding by various applicable laws; maintaining good conduct and behavior on and off-duty; not committing any acts that would bring reproach, discredit, or embarrassment to the profession; and having a prior negative disciplinary history. The Board's finding is supported by the record. A great deal of testimony was derived from Chief Willis and Commander Yancy about ensuring that an officer's on- and off-duty behavior did not bring reproach to the department by using sound judgment, the effects on the public trust when a police officer was arrested, and the embarrassment caused to both the immediate department and other departments when such events occurred. See, *e.g.*, *Collins v. Board of Fire & Police Commissioners of Genoa*, 84 Ill. App. 3d 516, 521 (1980) (noting that the phrase " 'conduct unbecoming an officer' " is an "elastic term subject to a wide variety of differing interpretations"). This testimony was consistent with the express language of the applicable rules of conduct and even McDonald's own testimony, where he admitted that getting arrested was "not a good thing" for the department. Although McDonald was not found guilty of

domestic battery charges based on the unavailability of a complaining witness, the rules do not require a conviction in order to sustain the burden of proof. Further, Officer Paup's testimony established that he would have signed charges against McDonald, even absent a complaining witness authorization, based on his own observation of the scene, his interview of the involved parties which included an observation that McDonald was intoxicated and still drinking even while being investigated, and the scratch on Nolan's neck. See *Scatchell*, 2022 IL App (1st) 201361, ¶ 36 ("It is within the Board's province to assign the appropriate weight to the evidence, resolve conflicts presented by it, and determine the credibility of the witnesses." A reviewing court "may not reweigh evidence or make an independent determination of the facts.")

¶ 153   Finally, we find McDonald's reliance on *Morelli* unavailing. There, a deputy sheriff was terminated from his position after domestic violence charges were filed against him by his girlfriend. *Morelli*, 315 Ill. App. 3d at 494. After the Board found him guilty of similar charges, the criminal case against him proceeded to trial. *Id.* at 496. At trial, the sheriff's girlfriend recanted her accusations of domestic violence, indicating that she had fabricated her story. Although she had attempted to withdraw her charges, she felt pressured by the prosecution to continue with the case. *Id.* The sheriff subsequently filed a motion for summary judgment in his ongoing administrative review appeal, arguing that his termination procedures had been based on hearsay evidence and that the case should be remanded to the Board to consider this new evidence. *Id.* at 496-97. The trial court denied the motion and affirmed the termination decision. *Id.* at 497. On appeal, the court found that the trial court erred in denying the motion and failing to remand the case, as it would be unjust to deny the sheriff an opportunity to present new evidence that the claims were now false. *Id.* at 499.

¶ 154 Although *Morelli* and the case before us involve simultaneous administrative and criminal proceedings, the cases are otherwise distinguishable. Here, the record reflects that the precipitating domestic violence charges in Du Page County were dismissed due to the unavailability of a complaining witness, not a direct recantation of the pending charges as occurred in *Morelli*. Indeed, Nolan's letter of recantation from McDonald's earlier domestic violence arrest was allegedly written in 2014, about eight years before the current incident. Further, Officer Paup's testimony reflected that he had been unaware of McDonald's previous arrest during his investigation, that he did not observe Nolan to be deceptive, and that he would have filed charges against McDonald even if Nolan had not authorized them. Again, we are mindful that it is not within our province to reweigh the evidence or credibility of the witnesses before the Board.

¶ 155 Based on our review of the record, we find no reason to disturb the Board's finding of guilt. Thus, we do not find that the Board's determination of liability was against the manifest weight of the evidence.

¶ 156                            6. Whether There Was Cause for Termination

¶ 157 Even if the lower "cause" standard applied, McDonald maintains that the record did not support termination. At the outset, McDonald contends that his arrest was an illegal basis for termination, citing section 2-103(A) of the Illinois Human Rights Act (775 ILCS 5/2-103(A) (West 2020)), and *Murillo v. City of Chicago*, 2016 IL App (1st) 143002. McDonald further contends that termination was an unreasonable penalty, given his consistent denial of misconduct and Nolan's failure to pursue charges against him. McDonald also challenges Chief Willis and Commander Yancy's testimony asserting that neither ever discussed how his continued employment would be detrimental to the department, especially when considering that none of his prior discipline was related to his arrest. Finally, as mitigating evidence, McDonald highlights the

stipulated testimony of other officers within the department, as well as his "mental health condition" by way of his documented alcoholism.

¶ 158　The Village rejects McDonald's attempt to centralize his arrest as the sole reason for termination, pointing to Chief Willis and Commander Yancy's testimony during the penalty phase that McDonald's disciplinary history over several years had demonstrated a failure to exercise sound judgment. Further, the Village continues, Chief Willis consistently testified how police misconduct affected the public trust. Finally, regarding McDonald's argument concerning his alcoholism, the Village argues that McDonald provided no evidence of pursuing any accommodations to address his problems that would justify a lesser sanction and, by his own admission, had only recently pursued treatment. The Board agrees that termination was warranted and further adds that McDonald failed to prove that his misconduct was a result of his alleged alcoholism, especially where McDonald consistently denied any misconduct.

¶ 159　"Cause" has been defined as "some substantial shortcoming which renders continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place." (Internal quotation marks omitted.) *Ehlers v. Jackson County Sheriff's Merit Comm'n*, 183 Ill. 2d 83, 89 (1998). Determinations of cause for discharge are not *prima facie* correct and are subject to judicial review. *McCleary*, 251 Ill. App. 3d at 998. However, "[a]n administrative tribunal's finding of cause for discharge commands respect, and it is to be overturned only if it is arbitrary and unreasonable or unrelated to the requirements of service." *Id.* Further, the decision to terminate is given substantial deference as the Board, not the reviewing court, stands in the best position to determine the effect of an officer's conduct on the department. *Valio v. Board of Fire & Police Commissioners of Itasca*, 311 Ill. App. 3d 321, 330-31 (2000).

¶ 160   Termination is warranted when officers display a lack of trustworthiness, reliability, good judgment, and integrity. See *Village of Oak Lawn v. Human Rights Comm'n*, 133 Ill. App. 3d 221, 224 (1985). Notably, even a single rule violation may constitute a sufficient basis for discharge. See *Siwek v. Police Board of Chicago*, 374 Ill. App. 3d 735, 738 (2007); *Calomino v. Board of Fire & Police Commissioners of Schaumburg*, 273 Ill. App. 3d 494, 499 (1995). Additionally, certain behaviors may constitute categorically substantial shortcomings, which may render an officer unfit for service as such conduct undermines the police force's discipline and efficiency. See *Sangirardi v. Village of Stickney*, 342 Ill. App. 3d 1, 18 (2003). Minor misconduct can also be a sufficient basis for discharge where the officer has a history of previous infractions. *Davis v. City of Evanston*, 257 Ill. App. 3d 549, 558-59 (1993).

¶ 161   Here, the Board determined that termination was appropriate, even after expressly noting that it had not considered any evidence regarding the 2014 domestic violence allegations. Instead, its consideration included the stipulated testimony of some members of the Maywood police department, McDonald's other disciplinary history, and its ultimate finding of guilt. In our view , even when considering the stipulated testimony, it is evident that the sanction was appropriate where McDonald's continued disciplinary infractions and the circumstances of the current arrest proved to sufficiently undermine the operations and efficiency of the department.

¶ 162   Turning first to Commander Yancy's testimony, it is clear that the department's decision to terminate was not merely based on one incident, but a line of incidents over several years demonstrating noncompliance and poor judgment. As noted prior, the record reflects that an extensive disciplinary history likely began from McDonald's start with the department, encompassing both on and off-duty misconduct, all of which affected the department's relationship with the public at large. Such misconduct ranged from ignoring directives or failing to

- 46 -

communicate with his superiors to failing to attend court appearances required by subpoena and not communicating his absence to all relevant parties and culminating in more serious violations involving alcohol and criminal adjudication. On the latter point, it must be noted that the department continually attempted to provide McDonald with second chances, where he entered into two settlement agreements with probation. Specifically, as to his DUI charge, Commander Yancy testified that he hoped McDonald's disciplinary settlement agreement would give him an opportunity to better himself for his family and the department.

¶ 163   Chief Willis's testimony reiterated that his assessment for discipline was also based on the specific offense and prior disciplinary history with the department. *Contra Murillo*, 2016 IL App (1st) 143002, ¶¶ 8-9, 22-29 (where basis for discharge was arrest from 20 years prior, termination violated Illinois Human Rights Act barring employment discrimination based on prior criminal history as such arrest records provided no information as to whether employee actually engaged in alleged conduct); see 775 ILCS 5/2-103(B) (West 2020) (prohibition against using arrest as basis for discharge does not limit an employer from obtaining or using other information that indicates a person actually engaged in the conduct for which they were arrested). Although Chief Willis admitted that McDonald's current situation was "embarrassing" to the department and the Village, he further maintained that his decision to terminate was not just based on the arrest, but due to a lack of sound decision making and detrimental effect on departmental operations "over a period of time." Ultimately, he did not see McDonald "doing anything for the department" that would align with the department's goals and mission, which as a reviewing court, we are not inclined to challenge. See *McCleary*, 251 Ill. App. 3d at 1001 ("It is apparent that a police officer who does not abide by the rules of the department will impair the discipline and efficiency of the police force."); *Sangirardi*, 342 Ill. App. 3d at 18 (the Board is given considerable deference in

- 47 -

determining the effect of an officer's conduct on the department). Further, although Chief Willis admitted that McDonald's prior disciplinary infractions were not always related to the same rules, we do not disagree with his assessment that continual discipline for numerous unsound decisions was an indicator that such prior discipline had not been effective. See *Albert v. Board of Fire & Police Comm'n of Schiller Park*, 99 Ill. App. 3d 688, 692 (1981) (sum total of behavior consisting of being intoxicated and disorderly, having unexcused absences from work, missing court dates, and having a general pattern of tardiness not individually sufficient as basis for discharge, but viewed in totality resulting in a substantial and detrimental impact on discipline and efficiency of police department).

¶ 164   Further, despite McDonald's contention that termination is unreasonable, especially when compared to other cases, cause for discharge may still be found, even if other employees or other police officers may have been disciplined differently, as this is usually dependent on the specific facts of the case and individualized prior disciplinary history. *Launius*, 151 Ill. 2d at 441-42 (1992) (collecting cases); see *Massingale v. Police Board of Chicago*, 140 Ill. App. 3d 378, 382 (1986) (termination unwarranted where officer's off-duty and DUI-related misconduct was only reported violation of department rules within seven years of service). We also find McDonald's testimony and argument on appeal that all his prior discipline had been related to his alcoholism to be disingenuous. Although problems with alcohol certainly played a role in the 2020 DUI and current arrest, there is no indication that his other on-duty infractions were related to alcoholism.

¶ 165   Finally, although there is some evidence that McDonald had been hospitalized for part of the proceedings and that he intended to request medical leave from the department, there was no evidence presented as to any formal diagnosis regarding alcoholism or treatment other than McDonald's own self-serving testimony about recently seeking treatment. See *Walsh v. Board of*

*Fire & Police Commissioners of Orland Park*, 96 Ill. 2d 101, 107-08 (1983) (remand appropriate where record showed documented history of psychiatric problems, even though unrelated to imposed discipline); *Hermesdorf v. Wu*, 372 Ill. App. 3d 842, 856 (2007) (discharge sanction unreasonable where discharged firefighter showed that act of misconduct was related to ongoing psychiatric conditions by way of medical records, letters, and forms); *Lynch v. City of Waukegan*, 363 Ill. App. 3d 1078, 1087-90 (2006) (discharge unwarranted where continued absence from work after expiration of paid and unpaid time off was due to diagnosed cognitive disorder). Indeed, despite the 2020 settlement agreement requiring him to seek treatment, by McDonald's own testimony, it appears that he did not affirmatively do so until his termination proceedings began. Moreover, if we were to credit McDonald's testimony that he did not understand the agreement's requirements, he was nonetheless still aware that his alcoholism was of sufficient concern to the department, thus making his admission that he continued to drink on the scene of his current arrest even more troubling.

¶ 166 Taken together, these behaviors display substantial shortcomings that would and had impaired the discipline and efficiency of the Maywood police department. We agree that McDonald's disciplinary history showed a lack of unsound judgment, which in turn culminated in his ultimate unreliability and disservice to the department and the public. Thus, we do not find this determination to be arbitrary or unreasonable and therefore affirm the Board's decision to discharge McDonald from his position as a police officer within the Village of Maywood.

¶ 167                                    III. CONCLUSION

¶ 168 For the reasons stated, we affirm the judgment of the circuit court.

¶ 169 Affirmed.

- 49 -

*McDonald v. Board of Trustees of the Fire & Police Commissioners of Maywood*,
**2025 IL App (1st) 231616**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CH-06838; the Hon. Pamela McLean Meyerson, Judge, presiding. |
| **Attorneys for Appellant:** | Raymond G. Garza and Keith A. Karlson, of Karlson Garza McQueary LLC, of Bolingbrook, for appellant. |
| **Attorneys for Appellee:** | John H. Kelly and Ericka J. Thomas, of Ottosen DiNolfo Hasenbalg & Castaldo, Ltd., of Naperville, for appellees Board of Trustees of the Fire & Police Commissioners of the Village of Maywood. |
| | Carlos Arevalo and Allen Wall, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for other appellees. |